Jack METCALF; Australians for Animals; Beach Marine Protection; S'Tassawood of the Cheaba Family of the Makah Nation, (Alberta N. Thompson); The Fund for Animals; Tim Walsh; Lisa Lamb; Sue Miller; Stephen Dutton; Deep Sea Charters, Inc., Plaintiffs–Appellants,

v.

William DALEY, Secretary U.S. Department of Commerce; James Baker, Administrator, National Oceanic and Atmospheric Administration; Rolland A. Schmitten, Director, National Marine Fisheries Service, Defendants–Appellees,

and

Makah Indian Tribe, Defendant–Intervenor–Appellee.

No. 98–36135.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 8, 2000.

Filed June 9, 2000.

---

**6.** Because we conclude that Ye is not removable under section 1227(a)(2)(A)(iii), we need not reach his due process claims.

Robert H. Oakley, United States Department of Justice, Washington, D.C., for the defendants-appellees.

Jonathan R. Lovvorn, Meyer & Glitzenstein, Washington, D.C., for the plaintiffs-appellants.

John B. Arum, Ziontz, Chestnut, Varnell, Berley & Slonim, Seattle, Washington, for the defendant-intervenor-appellee.

Kimberly M. McCormick, Latham & Watkins, San Diego, California, for the Amicus.

Before: TROTT, KLEINFELD, and SILVERMAN, Circuit Judges.

Opinion by Judge TROTT; Dissent by Judge KLEINFELD.

TROTT, Circuit Judge:

Appellants Jack Metcalf et al. appeal the district court's grant of summary judgment in favor of appellees William Daley, Secretary of Commerce; James Baker, Administrator of National Oceanic and Atmospheric Administration; Rolland A. Schmitten, Director of National Marine Fisheries Service (collectively "Federal Defendants"); and the Makah Indian Tribe ("Makah" or "Tribe"). Appellants argue that in granting the Makah authorization to resume whaling, the Federal Defendants violated the National Environmental Policy Act ("NEPA") by (1) preparing an Environmental Assessment ("EA") that was both untimely and inadequate, and (2) declining to prepare an Environmental Impact Statement ("EIS"). In addition, appellants challenge the district court's denial of their motion to compel production of administrative record material, as well as their motion to sup-plement the administrative record. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we REVERSE and REMAND to the district court.

# I

## FACTUAL BACKGROUND

The Makah, who reside in Washington state on the northwestern Olympic Peninsula, have a 1500 year tradition of hunting whales. In particular, the Makah target the California gray whale ("gray whale"), which annually migrates between the North Pacific and the coast of Mexico. During their yearly journey, the migratory gray whale population travels through the Olympic Coast National Marine Sanctuary ("Sanctuary"), which Congress established in 1993 in order to protect the marine environment in a pristine ocean and coastal area. A small sub-population of gray whales, commonly referred to as "summer residents," live in the Sanctuary throughout the entire year.

In 1855, the United States and the Makah entered into the Treaty of Neah Bay, whereby the Makah ceded most of their land on the Olympic Peninsula to the United States in exchange for "[t]he right of taking fish and of whaling or sealing at usual and accustomed grounds and stations. . . ." Treaty of Neah Bay, 12 Stat. 939, 940 (1855). Despite their long history of whaling and the Treaty of Neah Bay, however, the Makah ceased whaling in the 1920s because widespread commercial whaling had devastated the population of gray whales almost to extinction. Thus, the Tribe suspended whale hunting for seventy years, notwithstanding the important cultural role this practice played in their community.

Because the gray whale had become virtually extinct, the United States signed in 1946 the International Convention for the Regulation of Whaling in order "to provide for the proper conservation of whale stocks and thus make possible the orderly development of the whaling industry. . . ." In-

ternational Convention for the Regulation of Whaling, 62 Stat. 1716, 1717 (1946). The International Convention for the Regulation of Whaling enacted a schedule of whaling regulations ("Schedule") and established the International Whaling Commission ("IWC"), which was to be composed of one member from each signatory nation. *See id.* Furthermore, the International Convention for the Regulation of Whaling granted the IWC the power to amend the Schedule by "adopting regulations with respect to the conservation and utilization of whale resources," including quotas for the maximum number of whales to be taken in any one season. *Id.* at 1718–19.

Subsequently, in 1949, Congress passed the Whaling Convention Act to implement domestically the International Convention for the Regulation of Whaling. *See* 16 U.S.C.A. § 916 et seq. (1985). The Whaling Convention Act prohibits whaling in violation of the International Convention for the Regulation of Whaling, the Schedule, or any whaling regulation adopted by the Secretary of Commerce. *See id.* § 916c. In addition, the National Oceanic and Atmospheric Administration ("NOAA") and the National Marine Fisheries Service ("NMFS"), branches of the Department of Commerce, have been tasked with promulgating regulations to implement the provisions of the Whaling Convention Act. *See id.* § 916 et seq.; 50 C.F.R. § 230.1 (1998).

When the IWC was established on December 2, 1946, it took immediate action to protect the beleaguered mammal. Specifically, the IWC amended the Schedule to impose a complete ban on the taking or killing of gray whales. 62 Stat. at 1723. However, the IWC included an exception to the ban "when the meat and products of such whales are to be used exclusively for local consumption by the aborigines." *Id.* This qualification is referred to as the "aboriginal subsistence exception."

In addition to being shielded from commercial whaling under international law, the gray whale received increased protec-tion in 1970 when the United States designated the species as endangered under the Endangered Species Conservation Act of 1969, the predecessor to the Endangered Species Act of 1973 ("ESA"). In 1993, however, NMFS determined that the eastern North Pacific stock of gray whales had recovered to near its estimated original population size and was no longer in danger of extinction. Endangered Fish and Wildlife, 58 Fed.Reg. 3121, 3135 (1993). As such, this stock of gray whales was removed from the endangered species list in 1994. *Id.* At that point, and as required by the ESA, NMFS began a five-year monitoring program to document and to evaluate the viability of the stock subsequent to delisting.

After these gray whales were removed from the endangered species list, the Makah decided to resume the hunting of whales who migrated through the Sanctuary. To execute this plan, the Makah turned to the United States government— the Department of Commerce, NOAA, and NMFS—for assistance. The Tribe asked representatives from the Department of Commerce to represent it in seeking approval from the IWC for an annual quota of up to five gray whales.

As evidenced in an internal e-mail message written by an NMFS representative, the United States agreed in 1995 to "work with" the Makah in obtaining an aboriginal subsistence quota from the IWC. It was too late, however, to present the Makah's request formally at the IWC annual meeting scheduled to take place in May 1995. Nevertheless, the United States took the opportunity at the annual meeting to inform the Commission that: (1) the Makah had expressed an interest in harvesting up to five gray whales for ceremonial and subsistence purposes; and (2) the United States intended to submit in the future a formal proposal requesting such a quota.

After the 1995 annual meeting, NOAA prepared an internal report evaluating the merits of the Tribe's proposal in order to determine whether the United States

should support its request for a gray whale quota. In some respects, the report suggested that the United States should lend its support to the Tribe. For example, the report concluded that the Makah have a well-documented history of dependency on the gray whale, and that a return to whaling could benefit the Tribe. On the other hand, the report concluded also that allowing the Makah to whale could set a precedent for other tribes who had also expressed an interest in whaling. Despite these concerns, however, NOAA did not initiate the NEPA process by publishing a draft EA or EIS for public review.

In January 1996, Will Martin, an NOAA representative, sent an e-mail message to his colleagues informing them that "we now have interagency agreement to support the Makah's application in IWC for a whaling quota of 5 grey whales." Shortly thereafter, on March 22, 1996, NOAA entered into a formal written Agreement with the Tribe, which provided that "[a]fter an adequate statement of need is prepared [by the Makah], NOAA, through the U.S. Commissioner to the IWC, will make a formal proposal to the IWC for a quota of gray whales for subsistence and ceremonial use by the Makah Tribe." Furthermore, the Agreement provided for cooperation between NOAA and the Makah Tribal Council ("Council") in managing the harvest of gray whales. More specifically, NOAA agreed: (1) to monitor the hunt; (2) to assist the Council in collecting certain information (e.g., body length and sex of the landed whales; length and sex of any fetus in a landed whale; whether a whale that was struck, but not landed, suffered a potentially fatal wound from a harpoon or bomb emplacement); and (3) to collect specimen material from landed whales, including ovaries, ear plugs, baleen plates, stomach contents, and tissue samples. Finally, the Agreement provided that within thirty days of IWC approval of a quota, "NOAA will revise its regulations to address subsistence whaling by the Makah Tribe, and the Council will adopt a management plan and regulations to govern the harvest. . . ." The Agreement was signed by the Chairman of the Makah Tribal Council, Hubert Markishtum, and the Under Secretary for Oceans and Atmosphere, D. James Baker.

Pursuant to the Agreement, the Makah prepared an adequate statement of need, and the United States presented a formal proposal to the IWC for a quota of gray whales for the Tribe at the IWC annual meeting in June 1996. Several member nations supported the Makah whaling proposal, while others expressed concerns and indicated that they would vote against it. In short order, the proposal turned controversial. As the annual meeting was in progress, the United States House of Representatives Committee on Resources unanimously passed a resolution, introduced by Representatives Jack Metcalf (R–Washington) and George Miller (D–California), opposing the proposal. Ultimately, the United States realized that it did not have the three-quarters majority required to approve it. Thus, after consulting with the Makah, the United States withdrew the proposal in order to give the Tribe an opportunity to address the delegates' concerns.

In June 1997, an attorney representing the organizations Australians for Animals and BEACH Marine Protection wrote a letter to NOAA and NMFS alleging that the United States Government had violated NEPA by authorizing and promoting the Makah whaling proposal without preparing an EA or an EIS. In response, the Administrator for NOAA wrote to Australians for Animals and BEACH Marine Protection on July 25, 1997, informing them that an EA would be prepared. Twenty-eight days later, on August 22, 1997, a draft EA was distributed for public comment.

On October 13, 1997, NOAA and the Makah entered into a new written Agreement, which, in most respects, was identical to the Agreement signed in 1996. Unlike the earlier Agreement, however, the 1997 Agreement required the Makah to "confin[e] hunting activities to the open

waters of the Pacific Ocean outside the Tatoosh–Bonilla Line." Apparently, this provision was added to the Agreement in order to increase the probability that, although the whaling would occur in the Sanctuary, the Makah would hunt only the migratory whales, rather than the Sanctuary's "summer residents." Four days later, and after the signing of this new Agreement, NOAA/NMFS issued, on October 17, 1997, a final EA and a Finding of No Significant Impact ("FONSI").

The 1997 IWC annual meeting was held on October 18, 1997, one day after the final EA had been issued. Before this meeting, however, the United States (representing the Makah) and the Russian Federation (representing a Siberian aboriginal group called the Chukotka) had met to discuss the possibility of submitting a joint proposal for a gray whale quota, as the IWC previously had granted a gray whale quota for the benefit of the Chukotka. After conferring, the United States and the Russian Federation decided to submit a joint proposal for a five-year block quota of 620 whales. The total quota of 620 assumed an average annual harvest of 120 whales by the Chukotka and an average annual harvest of four whales by the Makah. We note in passing that because "not every gray whale struck will be landed," the EA eventually concluded that the cumulative impact of the removal of injured gray whales by the Makah would total not just twenty whales over a five-year period, but forty-one. The EA makes no explicit mention of the decision to submit this joint proposal to the IWC, which would include a block quota of 620 whales for the Chukotka.

At the meeting, some delegates expressed doubts about whether the Makah qualified for the quota under the "aboriginal subsistence" exception. For this reason, these delegates suggested amending the joint proposal to allow the quota to be used only by aboriginal groups "whose traditional subsistence and cultural needs have been recognized *by the International Whaling Commission.*" (emphasis added). Presumably, these delegates were at-

tempting to amend the proposal in a manner that would allow the Chukotka to harvest gray whales, but would prohibit the Makah from doing so. However, the United States rejected this amendment on the grounds that the IWC did not have an established mechanism for recognizing such needs. Instead, the delegates agreed to amend the proposal to allow the quota to be used only by aboriginal groups "whose traditional subsistence and cultural needs have been recognized." Shortly thereafter, the quota was approved by consensus with no objections.

On April 6, 1998, NOAA issued a Federal Register Notice setting the domestic subsistence whaling quotas for 1998. *See* Notice of Aboriginal Subsistence Whaling Quotas, 63 Fed.Reg. 16,701 (1998). The Notice stated that the Makah's subsistence and cultural needs had been recognized by both the United States and the IWC. *Id.* at 16,704. Accordingly, the Notice allowed the Makah to engage in whaling pursuant to the IWC-approved quota and Whaling Convention Act regulations. *Id.*

## II

## PROCEDURAL BACKGROUND

On October 17, 1997, the same day as the release of the FONSI, appellants, including, inter alia, Congressman Metcalf, Australians for Animals, and BEACH Marine Protection, filed a complaint against the Federal Defendants in the United States District Court for the District of Columbia. Appellants alleged that the Federal Defendants had violated NEPA, the Whaling Convention Act, and the Administrative Procedures Act in connection with their support of the Makah whaling proposal. After granting the Makah's motion to intervene, the district court transferred the case to the Western District of Washington.

The Federal Defendants provided the district court with 172 documents that they claimed constituted the administrative record. However, material had been redact-

ed from seventeen of these documents. Furthermore, pursuant to their request under the Freedom of Information Act, 5 U.S.C. § 552 (1996), appellants learned that NMFS possessed additional records relating to the Makah whaling proposal that had not been included in the administrative record. Because appellants believed the Federal Defendants were required to provide the court with the entire administrative record, they moved (1) to compel production of the materials that had been redacted from the administrative record, and (2) to supplement the administrative record with the additional documents discovered via the Freedom of Information Act request. The district court denied the first motion on the ground that the redacted material was protected by the "deliberative process privilege," which is an exception to the Freedom of Information Act, and it denied the second motion because appellants failed to establish that "the documents they sought would alter the summary judgment analysis."

Ultimately, the parties filed cross-motions for summary judgment on the merits, which were briefed and argued during the spring and summer of 1998. On September 21, 1998, the district court denied appellants' motion for summary judgment and granted the Federal Defendants' and the Makah's motions for summary judgment. Appellants now appeal.[1]

## III

### STANDARD OF REVIEW

▮ We review the district court's decision to grant or deny a motion for summary judgment de novo. *PCCE, Inc. v. United States,* 159 F.3d 425, 427 (9th Cir. 1998). However, we review substantive agency decisions concerning NEPA under the "arbitrary and capricious" standard, meaning we must determine whether the decision by NOAA/NMFS was "based on a consideration of the relevant factors," or whether their actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208, 1211 (9th Cir.1998) (quoting the Administrative Procedures Act, 5 U.S.C. § 706(2)(A)). "NEPA does not mandate particular results, but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions." *Muckleshoot Indian Tribe v. United States Forest Serv.,* 177 F.3d 800, 814 (9th Cir.1999). Under this deferential standard, we must defer to an agency's decision that is "fully informed and well-considered," *Save the Yaak Comm. v. Block,* 840 F.2d 714, 717 (9th Cir.1988), but we need not forgive a "clear error of judgment." *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378, 385, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989).

## IV

### NEPA CLAIM

#### A.

NEPA sets forth a "national policy which will encourage productive and enjoyable harmony between man and his environment ... [and] promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." 42 U.S.C.A. § 4321 (1994). NEPA does not set out substantive environmental standards, but instead establishes "action-forcing" procedures that require agencies to take a "hard look" at environmental consequences. *See Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 348, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). We have characterized the statute as "primarily procedural," and held that "agency action taken without observance of the procedure required by law will be set aside."

---

1. The Humane Society of the United States ("Humane Society") made a motion for leave to file an amicus brief, which we granted. However, we also granted appellees' joint mo-

tion to strike the extra-record documents that the Humane Society submitted with its amicus brief.

*Save the Yaak,* 840 F.2d at 717. In this respect, we have observed in connection with the preparation of an EA that "[p]roper timing is one of NEPA's central themes. An assessment must be 'prepared early enough so that it can serve practically as an important contribution to the decisionmaking process and will not be used to rationalize or justify decisions already made.'" *Id.* at 718 (quoting 40 C.F.R. § 1502.5 (1987)).

■ The phrase "early enough" means "at the earliest possible time to insure that planning and decisions reflect environmental values." *Andrus v. Sierra Club,* 442 U.S. 347, 351, 99 S.Ct. 2335, 60 L.Ed.2d 943 (1979); *see also* 40 C.F.R. § 1501.2 (1999). The Supreme Court in referring to NEPA's requirements as "action forcing," *Andrus,* 442 U.S. at 350, 99 S.Ct. 2335, has embraced the rule that for projects directly undertaken by Federal agencies, environmental impact statements "shall be prepared at the feasibility analysis (go-no go) stage and may be supplemented at a later stage if necessary." *Id.* at 351 n. 3, 99 S.Ct. 2335; *see also* 40 C.F.R. § 1502.5(a) (1999).

■ All of these rules notwithstanding, NEPA does not require that agency officials be "subjectively impartial." *Environmental Defense Fund v. Corps of Eng'rs of the U.S. Army,* 470 F.2d 289, 295 (8th Cir.1972). The statute does require, however, that projects be objectively evaluated.

> NEPA assumes as inevitable an institutional bias within an agency proposing a project and erects the procedural requirements of § 102 to insure that "there is no way [the decision-maker] can fail to note the facts and understand the very serious arguments advanced by the plaintiff if he carefully reviews the entire environmental impact statement."

*Id.* (quoting *Environmental Defense Fund v. Corps of Eng'rs of the U.S. Army,* 342 F.Supp. 1211, 1218 (E.D.Ark.1972)).

■ In summary, the comprehensive "hard look" mandated by Congress and required by the statute must be timely, and it must be taken objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made. As the Eighth Circuit observed in *Environmental Defense Fund,* "[t]he unequivocal intent of NEPA is to require agencies to consider and give effect to the environmental goals set forth in the Act, not just to file detailed impact studies which will fill governmental archives." *Id.* at 298.

■ NEPA requires that an EIS be prepared for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C.A. § 4332(2)(C) (1994). However, if, as here, an agency's regulations do not categorically require the preparation of an EIS, then the agency must first prepare an EA to determine whether the action will have a significant effect on the environment. *See* 40 C.F.R. § 1501.4 (1999); *Salmon River Concerned Citizens v. Robertson,* 32 F.3d 1346, 1356 (9th Cir.1994). If, in light of the EA, the agency determines that its action will significantly affect the environment, then an EIS must be prepared; if not, then the agency issues a FONSI. *See* 40 C.F.R. §§ 1501.4, 1508.9 (1999); *Salmon River,* 32 F.3d at 1356. "If an agency decides not to prepare an EIS, it must supply a 'convincing statement of reasons' to explain why a project's impacts are insignificant." *Blue Mountains,* 161 F.3d at 1211 (quoting *Save the Yaak,* 840 F.2d at 717).

In this case, the Federal Defendants did (1) prepare an EA, (2) decide that the Makah whaling proposal would not significantly affect the environment, and (3) issue a FONSI, but they did so after already having signed two agreements binding them to support the Tribe's proposal. Appellants assert that, in so doing, the Federal Defendants violated NEPA in several ways. Appellants argue that, although NOAA/NMFS ultimately prepared an EA, they violated NEPA because they prepared the EA too late in the process.

According to appellants, "by making a commitment to authorize and fund the Makah whaling plan, and then drafting a NEPA document which simply rubber-stamped the decision ..., defendants eliminated the opportunity to choose among alternatives, ... and seriously imped[ed] the degree to which their planning and decisions could reflect environmental values." Additionally, appellants contend that the Federal Defendants violated NEPA by preparing an inadequate EA, and by issuing a FONSI instead of preparing an EIS.

### B.

■ We begin by considering appellants' argument that the Federal Defendants failed timely and in the proper sequence to comply with NEPA. As provided in the regulations promulgated to implement NEPA, "[a]gencies shall integrate the NEPA process with other planning *at the earliest possible time* to insure that planning and decisions reflect environmental values, to avoid delays later in the process, and to head off potential conflicts." 40 C.F.R. § 1501.2 (emphasis added); *see also id.* § 1502.5 ("An agency shall commence preparation of an [EIS] as close as possible to the time the agency is developing or is presented with a proposal...."). Furthermore, this court has interpreted these regulations as requiring agencies to prepare NEPA documents, such as an EA or an EIS, "before any irreversible and irretrievable commitment of resources." *Conner v. Burford,* 848 F.2d 1441, 1446 (9th Cir.1988); *see also EDF v. Andrus,* 596 F.2d 848, 852 (9th Cir.1979). Thus, the issue we must decide here is whether the Federal Defendants prepared the EA too late in the decision-making process, i.e., after making an irreversible and irretrievable commitment of resources. We conclude that they did.

The purpose of an EA is to provide the agency with sufficient evidence and analysis for determining whether to prepare an EIS or to issue a FONSI. 40 C.F.R. § 1508.9. Because the very important decision whether to prepare an EIS is based solely on the EA, the EA is fundamental to the decision-making process. In terms of timing and importance to the goals of NEPA, we see no difference between an EA and an EIS in connection with when an EA must be integrated into the calculus. In the case at bar, the Makah first asked the Federal Defendants to help them secure IWC approval for a gray whale quota in 1995; however, NOAA/NMFS did not prepare an EA until 1997. During these two years, the United States and the Makah worked together toward obtaining a gray whale quota from the IWC. In January 1996, an NOAA representative informed his colleagues that "we now have interagency agreement to support the Makah's application in IWC for a whaling quota of 5 grey whales." More importantly, in March 1996, more than a year before the EA was prepared, NOAA entered into a contract with the Makah pursuant to which it committed to (1) making a formal proposal to the IWC for a quota of gray whales for subsistence and ceremonial use by the Makah and (2) participating in the management of the harvest. To demonstrate the firmness of this commitment, we need only to look at the EA, which says, "In early 1996, [NOAA and the Makah Tribal Council] signed an agreement in which the United States committed to make a formal request to the IWC...."

The Federal Defendants did not engage the NEPA process "at the earliest possible time." Instead, the record makes clear that the Federal Defendants did not even consider the potential environmental effects of the proposed action until long after they had already committed in writing to support the Makah whaling proposal. The "point of commitment" in this case came when NOAA signed the contract with the Makah in March 1996 and then worked to effectuate the agreement. It was at this juncture that it made an "irreversible and irretrievable commitment of resources." As in *Save the Yaak,* the "contracts were awarded prior to the preparation of the EAs.... These events demonstrate that

the agency did not comply with NEPA's requirements concerning the timing of their environmental analysis, thereby seriously impeding the degree to which their planning and decisions could reflect environmental values." *Save the Yaak*, 840 F.2d at 718–19. Although it could have, NOAA did not make its promise to seek a quota from the IWC and to participate in the harvest conditional upon a NEPA determination that the Makah whaling proposal would not significantly affect the environment.

Had NOAA/NMFS found after signing the Agreement that allowing the Makah to resume whaling would have a significant effect on the environment, the Federal Defendants would have been required to prepare an EIS, and they may not have been able to fulfill their written commitment to the Tribe. As such, NOAA would have been in breach of contract. Although the United States delegates to the 1996 IWC meeting ultimately withdrew their proposal for a Makah aboriginal subsistence whaling quota, they did so with the Tribe's approval and because the proposal did not have adequate support from other IWC delegations, *not* in order to reconsider environmental concerns. The firmness of the 1996 Agreement became even clearer and more resolute in 1997 when NOAA entered into a new, similar contract with the Tribe to pursue its whaling quota at the 1997 IWC meeting. This Agreement was signed four days *before* the final EA in this case was issued. In the EA, the agencies referred to this second Agreement as having "renewed the cooperative Agreement" signed in 1996. This is strong evidence that NOAA and other agencies made the decision to support the Tribe's proposal in 1996, before the EA process began and without considering the environmental consequences thereof. By the time the Federal Defendants completed the final EA in 1997, the die already had been cast. The "point of commitment" to this proposal clearly had come and gone.

As in *Conner v. Burford*,[2] *Environmental Defense Fund*, and *Port of Astoria v. Hodel*, 595 F.2d 467 (9th Cir.1979), the contracts here amounted to a surrender of the Government's right to prevent activity in the relevant area. *Cf. Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1063 (9th Cir.1998) (holding that the Forest Service did not make an "irreversible and irretrievable commitment of resources" when it prepared a Tentative Operating Schedule because "the agency was free to follow the [Schedule] or alter it as conditions warrant").

It is highly likely that because of the Federal Defendants' prior written commitment to the Makah and concrete efforts on their behalf, the EA was slanted in favor of finding that the Makah whaling proposal would not significantly affect the environment. As the court below noted, "the longer the defendants worked with the Tribe toward the end of whaling, the greater the pressure to achieve this end.... [A]n EA prepared under such circumstances might be subject to at least a subtle pro-whaling bias." The EA itself somewhat disingenuously claims in 1997 that the "decision to be made" is "whether to support the Makah Tribe in its effort to continue its whaling tradition," when in point of fact that decision had already been made in contract form. To quote the 1996 Agreement, "after an adequate statement of need is prepared, NOAA ... will make a formal proposal to the IWC for a quota of gray whales...." The Makah satisfied its part of the bargain in 1996, binding the Federal Defendants to deliver on theirs, as they did at the IWC meeting in June 1996. Also, NOAA/NMFS's statement in the EA that "[a]ny perception that the U.S. Government is trying to withdraw its support for Makah whaling would likely plunge the Tribe into a difficult controversy with the United States" strongly suggests that the Federal Defendants were predisposed to issue a FONSI.

**2.** *Conner v. Burford* provides an excellent example of how to differentiate between mineral leases that entail an "irreversible and irretrievable commitment of resources" and those that do not. *Conner*, 848 F.2d at 1446–51.

NEPA's effectiveness depends entirely on involving environmental considerations in the initial decisionmaking process. *See* 40 C.F.R. §§ 1501.2, 1502.5; *see also Methow Valley*, 490 U.S. at 349, 109 S.Ct. 1835 (explaining that NEPA "ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts"). Moreover, the Supreme Court has clearly held that treaty rights such as those at stake in this case "may be regulated ... in the interest of conservation ..., provided the regulation ... does not discriminate against the Indians." *Puyallup Tribe v. Department of Game of Wash.*, 391 U.S. 392, 398, 88 S.Ct. 1725, 20 L.Ed.2d 689 (1968). Here, before preparing an EA, the Federal Defendants signed a contract which obligated them both to make a proposal to the IWC for a gray whale quota and to participate in the harvest of those whales. We hold that by making such a firm commitment before preparing an EA, the Federal Defendants failed to take a "hard look" at the environmental consequences of their actions and, therefore, violated NEPA.

Our decision in *Thomas v. Peterson*, 753 F.2d 754 (9th Cir.1985), supports this conclusion. In that case, the Forest Service planned to construct a road in order to facilitate timber sales. *See id.* at 756–57. The Forest Service wanted to build the road, and then prepare an EA/EIS to analyze the environmental impact of the timber sales. *See id.* at 757. However, the court explained that "[b]uilding the road swings the balance decidedly in favor of timber sales even if such sales would have been disfavored had road and sales been considered together before the road was built." *Id.* Accordingly, the *Peterson* court held that the Forest Service must prepare an EIS before deciding whether to approve the proposed road. *Id.* at 761. Similarly, we conclude that the Federal Defendants should not have fully committed to support the Makah whaling proposal before preparing the EA because doing so probably influenced their evaluation of the environmental impact of the proposal.

We want to make clear, however, that this case does not stand for the general proposition that an agency cannot begin preliminary consideration of an action without first preparing an EA, or that an agency must always prepare an EA before it can lend support to any proposal. We have discussed this distinction in *Association of Pub. Agency Customers, Inc. v. Bonneville Power Admin.*, 126 F.3d 1158 (9th Cir.1997), where we pointed out that "an agency can formulate a proposal or even identify a preferred course of action before completing an EIS." *Id.* at 1184. We noted also that "Council on Environmental Quality ("CEQ") regulations actually encourage identification of a preferred course of action during the NEPA process...." *Id.* at 1185 (citing 40 C.F.R. § 1502.14(e)). Rather, our holding here is limited to the unusual facts and circumstances of this case where the defendants already had made an "irreversible and irretrievable commitment of resources"— i.e., by entering into a contract with the Makah before they considered its environmental consequences and prepared the EA.[3]

## V

## REMEDY

■ Appellees argue that, even if the Federal Defendants did violate NEPA by preparing the EA after deciding to support Makah whaling, the issue is moot because the only relief that the court could order is the preparation of an adequate EA, which, appellees contend, already has been done. In making this argument, appellees rely on *Realty Income Trust v. Eckerd*, 564 F.2d 447 (D.C.Cir.1977), in which the court refused to remand to the district court because an adequate EIS had been prepared

---

3. Because we conclude that the Federal Defendants violated NEPA by preparing the EA too late, we need not directly decide whether they also violated NEPA by preparing an inadequate EA, or by issuing a FONSI rather than preparing an EIS.

before any action was taken that might harm the environment. *Id.* at 457. The *Eckerd* court explained:

> The problem here, to repeat, was simply one of timing, that is, that there was not a timely filing of an EIS with Congress. No complaint remains on appeal that the statements in substance were inadequate in any way.

*Id.*

We conclude that the case at bar is distinguishable from *Eckerd* and, therefore, appellees' reliance on that case is misplaced. Unlike in *Eckerd*, appellants do not concede that the EA that ultimately was prepared is adequate. To the contrary, appellants contend that the EA is demonstrably suspect because the process under which the EA was prepared was fatally defective—i.e., the Federal Defendants were predisposed to finding that the Makah whaling proposal would not significantly affect the environment. We agree. Moreover, appellants vigorously maintain that the EA is deficient with respect to its content and conclusions.

■ Our conclusions about the EA in this case raise an obvious question: Having already committed in writing to support the Makah's whaling proposal, can the Federal Defendants now be trusted to take the clear-eyed hard look at the whaling proposal's consequences required by the law, or will a new EA be a classic Wonderland case of first-the-verdict, then-the-trial? In order to avoid this problem and to ensure that the law is respected, must we—and can we—set aside the FONSI and require the Federal Defendants to proceed directly to the preparation of an Environmental Impact Statement? On reflection, and in consideration of our limited role in this process, we have decided that it is appropriate only to require a new EA, but to require that it be done under cir-

cumstances that ensure an objective evaluation free of the previous taint. Unlike many of the disputes we are called on to resolve, time here is not of the essence. Although the doctrine of laches cannot defeat Indian rights recognized in a treaty, *see United States v. Washington,* 157 F.3d 630, 649 (9th Cir.1998), the Makah's seventy year hiatus in connection with whale hunting suggests that a modest delay occasioned by the need to respect NEPA's commands will cause no harm. *Cf. Forelaws on Bd. v. Johnson,* 743 F.2d 677 (9th Cir.1984) (operation of contracts in third year of 20–year term not enjoined because of statutory mandate of implementation of a contractual system).

The manner of ensuring that the process for which we remand this case is accomplished objectively and in good faith shall be left to the relevant agencies. Should a new EA come back to the courts for additional scrutiny, however, the burden shall be on the Federal Defendants to demonstrate to the district court that they have complied with this requirement.

Accordingly, we REVERSE and REMAND to the district court. The district court is directed to order the Federal Defendants to set aside the FONSI, suspend implementation of the Agreement with the Tribe, begin the NEPA process afresh, and prepare a new EA.[4] Costs are awarded to Appellants Metcalf et al.

REVERSED and REMANDED.

KLEINFELD, Circuit Judge, dissenting:

I respectfully dissent.

The federal government reconciled two policies, one favoring aboriginal Indian interests and another favoring preservation of sea mammals, by choosing to advance

---

4. Our determination that the Federal Defendants violated NEPA and, therefore, must prepare a new EA renders moot appellants' argument that the district court erred in denying its motions to compel production of administrative record material and to supplement the administrative record. With the preparation of a new EA, a new administrative record will also be generated. Given this background, however, the agencies would be well-advised to prepare this record with the expectation that every bit of it will be open to scrutiny should this matter return to the courts yet a second time.

the Indian whale-hunting interests. But before allowing the Indians to hunt whales, the government took the "hard look" at environmental consequences that was required by law. Nothing more was required. The majority opinion errs in three respects: (1) it imposes a novel version of the "objectivity" requirement that cannot be applied in a predictable, consistent manner by other panels in other cases; (2) it misconstrues the regulation that controls the time when an environmental assessment ought to be prepared; (3) it requires that a new environmental assessment be prepared without finding anything wrong with the old one. Obviously the agency did not prepare the environmental assessment until its officials had already decided that they wanted to let the Makah Indians hunt whales. Why else would they have gone to the trouble of preparing an environmental assessment? But without identifying something wrong with the environmental assessment (and we have not), we have no warrant for setting it aside.

First, "objectivity." There is a statutory and regulatory basis for inferring that an environmental assessment must be "objective." [1] But what does "objective" mean? The majority concedes that the agency can "identify a preferred course of action" before preparing the environmental assessment. Our decision in *Association of Public Agency Customers v. Bonneville Power Administration* [2] establishes that the agency does not have to be impartial, and can decide what it wants to do before preparing the environmental assessment or impact statement.[3] And the majority reasonably adopts the Eighth Circuit view, that "NEPA assumes as inevitable an institutional bias within an agency proposing a project" and the Eighth Circuit's rejection of the proposition that "NEPA requires agency officials to be subjectively impartial." [4] As *Wyoming Outdoor Council v. United States Forest Service* [5] says, "it is not logical that the Service would be required to delay its undertakings and commit its resources to the preparation of an EIS which might ultimately prove unnecessary." [6]

But then the majority apparently holds that the environmental assessment in this case fails the objectivity test because "it is highly likely that," because the agency had committed itself to the tribe, "the EA was slanted." This holding cannot be reconciled with the others, and cannot be applied in a predictable, consistent manner. The agency's policy choice, to allow the Makah tribe to hunt whales if it could, cannot be said to "slant" the environmental assessment, when we do not identify anything wrong with the environmental assessment, unless the test of objectivity is exactly what we say it is not, "institutional bias within an agency" and subjective partiality. All the majority shows is that the agency knew the answer it wanted before it asked the question. But under *Bonneville Power*, that "institutional bias" does not vitiate the environmental assessment's "objectivity". To show that the environmental assessment is not objective, an objector must show that there is something wrong with the assessment, not just that the agency that prepared it wanted a particular result.

The meaning of "objective" is "expressing or involving the use of facts without distortion by personal feelings or prejudices." [7] Thus our inquiry should be fo-

---

1. *See* 42 U.S.C. § 4332(2)(D) (1994); 40 C.F.R. § 1502.14(a) (1999).

2. *Association of Pub. Agency Customers v. Bonneville Power Admin.*, 126 F.3d 1158 (9th Cir.1997).

3. *See id.* at 1185.

4. *Environmental Defense Fund Inc. v. Corps of Engineers*, 470 F.2d 289, 295 (8th Cir.1972).

5. *Wyoming Outdoor Council v. United States Forest Serv.*, 165 F.3d 43 (D.C.Cir.1999).

6. *Id.* at 49.

7. Webster's Third New International Dictionary 1155–56 (1981).

cused on the text of the environmental assessment that the agency prepared, not on the motivations that the agency had for slanting it. Of course it had a motive to slant the statement in favor of its preferred policy. Any executive agency can be expected to try to advance its and the president's policy preferences. If we require a record cleansed of any indication of a policy preference, all we will do is push the indicators of agency preference off the written record into the land of winks and nods, and choosing people to prepare the reports who, because of their known policy preferences, can be counted on to reach the conclusions the agency wants. We should read the environmental assessment and decide whether it states the facts without distortion, and fairly sets out the alternatives and the reasons for and against them. The district judge did so, and found nothing wrong with the environmental assessment, and neither have we. That should be the end of the "objectivity" inquiry.

Second, timing. The majority holds that the "at the earliest possible time"[8] requirement in the regulations means before "making an irreversible and irretrievable commitment of resources."[9] I agree with that proposition of law. But then the majority goes on to say that because the agency's commitment to the Makah tribe preceded the environmental assessment, the environmental assessment came too late. I respectfully disagree with the application of law to facts, though the issue is close.

The commitment to allow the Makah tribe to hunt whales was not an "irreversible and irretrievable commitment," despite the contract. The majority opinion misses the difference between the two contracts. In *Conner v. Burford*,[10] we held that where the agency retained regulatory authority prior to drilling, it could prepare the environmental impact statement *after* it issued oil and gas leases, but where the oil companies would immediately be free to build roads and drill without further regulatory approval, the agency had to prepare the environmental impact statement before issuing leases.[11] Thus the test in *Conner* was whether the oil companies could start drilling once the contract was signed, or whether there was a subsequent regulatory approval process. Applying that test here, to whale hunting rather than okay drilling, there was a subsequent regulatory process before the first harpoon could be fired, so the environmental assessment was not untimely. Rather than following *Conner* as it purports to, the majority is deciding this case inconsistently with *Conner*. The majority also misreads *Thomas v. Peterson*;[12] it concerns "connected actions," in that case a timber sale and the road to be built for the logging, and has no application to the case at bar, because no "connected actions" regulation has no application here. The timing requirement of the statute and regulations required that the agency prepare an environmental assessment before the Makah tribe was allowed to hunt whales. It did. There was no "irretrievable commitment" until no further regulatory process stood between the tribe and the whales.

Promising to support the Makah whaling proposal before the International Whaling Commission was not an "irretrievable commitment of resources," for several reasons. Signing the contract did not entitle the Indians to kill whales. International Whaling Commission approval was sufficiently unlikely (the aboriginal "subsistence exception" was a hard sell to the Commission because the Makah had not hunted whales for seventy years and did not depend on them for subsistence) so that no one could count on any whale

---

**8.** 40 C.F.R. § 1501.2.

**9.** Op. at 1143.

**10.** *Conner v. Burford,* 848 F.2d 1441 (9th Cir. 1988).

**11.** *See id.* at 1451.

**12.** *Thomas v. Peterson,* 753 F.2d 754 (9th Cir. 1985).

hunts despite the agency's support. There was no point wasting the public's time and money on an environmental assessment until and unless the International Whaling Commission made Makah whale hunting a possibility. Doing the NEPA process before the agency action is even possible, as today's majority requires, is like setting a wedding date, booking the hall, buying the dress, and paying the band before the couple has gotten engaged.

Even after the International Whaling Commission approved a Makah whale quota, the Makah still could not hunt whales (just as the oil companies in *Conner* could not drill). The agency had to decide upon and promulgate regulations.[13] An earlier version of the contract, made when the agency was likely to fail (it did fail) before the International Whaling Commission, said that the agency would adopt regulations within 30 days after the International Whaling Commission approved the quota. But once the Commission looked likely to come around on a joint Russian–American annual quota of 120 whales for the Siberians and 4 for the Makah (and before the Makah quota was granted), the agency and the Makah signed a novation replacing the old contract. The new contract obligated the Makah Tribal Council, but not the federal agency, to adopt a management plan and regulations. The agency's hands were not tied.[14] If the agency had changed policy, and decided not to issue regulations permitting Makah whale hunting as a result of the environmental assessment, the political strength of the advocacy groups opposing whale hunting, or anything else, the Makah might reasonably have regarded the policy change as a bad faith betrayal. But government changes

policy continually, restrained only by concerns for fairness, public opinion, and that the incentives it offered in the future to induce private action would have to be higher to the extent that people felt they could not rely on the stability of government policies.[15] Specific performance of the contract could not have been compelled [16] and it is hard to imagine a damages remedy.

Preparation of an environmental assessment, and, if necessary, an environmental impact statement, is itself a major commitment of resources, and it does not make practical sense to require that these resources be wasted where the agency is not yet in a position to implement a policy choice requiring that expenditure. The draft and final environmental assessments, including an appendix of public comment, and the finding of no significant impact, consist of 200 pages of single spaced print, replete with expensive experts' opinions and research. It would be a foolish waste of time and money for an agency to initiate this process before the agency had decided on a policy. As *Wyoming Outdoor Council v. United States Forest Service* [17] says, "it is not logical that the Service would be required to delay its undertakings and commit its resources to the preparation of an EIS which might ultimately prove unnecessary." [18]

Third, remedy. The majority's remedy brings us into conflict with the only other circuit to have considered the issue. In *Realty Income Trust v. Eckerd,* [19] the agency made a proposal to Congress, which involved moving a stream, before preparing its environmental impact statement. The statute plainly required the environ-

---

**13.** *See* 16 U.S.C. § 916 et seq. (1985); 50 C.F.R. § 230.1 (1998).

**14.** *Bowen v. Public Agencies Opposed,* 477 U.S. 41, 52, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986); *Madera Irrigation Dist. v. Hancock,* 985 F.2d 1397, 1400 (9th Cir.1993).

**15.** *See Madera,* 985 F.2d at 1397.

**16.** *See* 28 U.S.C. § 1491; *Florida Dep't of State v. Treasure Salvors, Inc.,* 458 U.S. 670, 689, 102 S.Ct. 3304, 73 L.Ed.2d 1057 (1982).

**17.** *Wyoming Outdoor Council v. United States Forest Serv.,* 165 F.3d 43 (D.C.Cir.1999).

**18.** *Id.* at 49.

**19.** *See Realty Income Trust v. Eckerd,* 564 F.2d 447, 457 (D.C.Cir.1977).

mental impact statement to be included with the proposal, not to come afterwards as it did,[20] so the environmental impact statement was prepared too late. The District of Columbia Circuit held that construction could proceed without a second environmental impact statement, despite the unlawful timing, because "equity should not require the doing of a vain or useless thing." [21] That is to say, even if the environmental impact statement was prepared too late, the agency would not be required to prepare a new one in the absence of a showing that the statement was substantively inadequate.

The majority purports to distinguish *Eckerd* on the basis that in the case at bar, the environmental advocacy groups contend that the environmental assessment was "demonstrably suspect because the process under which the EA was prepared was fatally defective—i.e., the federal defendants were predisposed to finding that the Makah whaling proposal would not significantly affect the environment." [22] But that does not distinguish *Eckerd* at all. The majority concedes in its discussion of the "objectivity" requirement, the "process" *cannot* be "fatally defective" because the agency had a predisposition. Something that is immaterial cannot be a material distinction. True, there is a challenge to the substantive adequacy of the environmental assessment in this case and not in *Eckerd.* But we do not rule upon the challenge. The district court carefully examined all the substantive challenges and found them to be without merit, and we have found no fault with the district court's determination. In the absence of a judicial determination that the environmental assessment really *was* inadequate, as opposed to an unsuccessful argument *claiming* inadequacy, we cannot conclude that preparing another environmental assessment would be other than what *Eckerd* terms "a vain or useless thing."

It is impractical to suppose that executive agencies will be uncommitted to policies when they prepare environmental assessments and environmental impact statements. It is precisely their determinations to move ahead with one proposal or another that occasions the assessments and impact statements. So long as the agency prepares an objective statement giving the initiative the required "hard look," prior to going ahead with it, it has done its duty, and even if it prepares the statement too late, it is pointless to require another one unless there is something wrong with the one the agency submitted. Environmental assessments and environmental impact statements are unlikely to persuade agency personnel, who initiated a project, to change their minds. Few things in government are as hard to shake as a bureaucratic policy choice.

The value of the environmental assessments and impact statements comes mostly after the agency has settled on a policy choice. The process of preparing them mobilizes groups that may generate political pressure sufficient to defeat the executive initiative. Exploration of the alternatives, and the facts brought out in preparation, may educate the agency, so that the initiative is modified in a useful way. The process may educate the agency about interests and concerns of which it was not aware, so that implementation will be more sensitive. The quality of the statement may persuade Congress or others who must pass on the agency proposal that the agency was wrong in its policy choice. The statement also stands as an archive with which the public may evaluate the correctness of the agency's policy choices after implementation, to decide whether the agency has done what it promised during implementation, and whether to repose more or less confidence in the agency's policy choices in the future. Preparation and publication of the statements eliminate the agency's monop-

**20.** *See* 42 U.S.C. § 4332(C).

**21.** *Realty Income Trust,* 564 F.2d at 458.

**22.** Op. at 1145.

oly of information, thus enabling other participants in the political process to use the information to overcome the agency's policy choice. None of these values were subverted in this case by the agency's commitment to the Makah Tribe. And nothing has been shown to be wrong with the environmental assessment. There is a legitimate clash of values between those who care more about whale hunting from the point of view of the hunter, and those who care more from the viewpoint of the whale. The political organs of government have the authority to choose. We have no warrant in this case to interfere.