**HAWAII COUNTY GREEN PARTY, Plaintiff,**

v.

**William Jefferson CLINTON, in his official capacity as President of the United States, et al., Defendants.**

**Hawaii County Green Party, et al., Plaintiffs,**

v.

**William Jefferson Clinton, in his official capacity as President of the United States, et al., Defendants.**

**Nos. Civ.A. 98–232 ACK, Civ.A. 00–166 ACK.**

United States District Court, D. Hawaii.

July 10, 2000.

Lanny Sinkin, Hilo, HI, for Plaintiff.

Thomas A. Helper, Office of the United States Attorney, Honolulu, HI, Mark A. Brown, U.S. Department of Justice, Environment & Natural Resources, Division, Washington, DC, for Defendants.

## ORDER DENYING PLAINTIFF'S MOTION TO SET ASIDE ORDER AND TO CONSOLIDATE REOPENED CASE WITH PENDING CASE; ORDER GRANTING MOTION TO DISMISS

KAY, District Judge.

### SYNOPSIS

The Court GRANTS Defendants' Motion to Dismiss Civ. No. 00–166. This action was brought prematurely, as at this point in time the Navy's EIS–OEIS application for its SURTASS LFA program has not been approved. While the Navy has expended substantial funds on research, including research vessels, over the past years, the Court concludes that this does not constitute an irretrievable and irreversible action such that the agency is

"locked in" to proceeding with this program. Once approved, Plaintiffs will have an opportunity to timely challenge the EIS. The Navy agreed (via an in court stipulation that includes an exception that the stipulation will be revisited if national security so dictates) that there will be no SURTASS LFA testing or deployment around the Hawaiian Islands until after the OEIS and EIS process is complete, they have been approved, and the Notice of Record of Decision is published for 30 days in the Federal Register. This will provide Green Party and others an opportunity to file legal challenges prior to deployment. Accordingly, at this stage, the Court finds that the claims brought by Plaintiffs are not ripe for suit, and that the Plaintiffs lack standing. The Court further finds that Plaintiffs have failed to comply with the 60 days jurisdictional notice requirement with respect to two of their ESA claims.

Furthermore, the Court finds that Plaintiffs have not established extraordinary grounds that would warrant reopening Civ. No. 98–232, which was previously dismissed by this Court. The Court notes that the basis for the requested reopening is founded on facts that have arisen subsequent to the dismissal of the case. Accordingly, the Motion to Reopen is DENIED.

Despite the above outcome, the Court notes and expresses its concern that, according to an independent study sponsored by the Navy, low frequency sonar tests do indeed affect marine life. Although the researchers are not sure whether the tests have a harmful impact, they recommend at the very minimum that the Navy should avoid active breeding areas when performing tests. Further, the Court notes that the article states that whales breed and calf off Hawaii in the winter and spring before migrating north to the Gulf of Alaska. Following these recommendations would seem to have a severe impact on any testing off Hawaii. *See Navy study indicates sonar has effect on whales,* Honolulu Advertiser, June 22, 2000, at A3.

### INTRODUCTION

Two motions in two cases came before the Court in a hearing on June 13, 2000. The Hawaii County Green Party (individually, "Green Party") and other environmental organizations and activists (collectively, "Plaintiffs") filed a complaint February 29, 2000[1] ("the 2000 case") against President Clinton and various other federal officers, including the secretaries of commerce, defense, and the Navy and certain officers of the National Marine Fisheries Service ("NMFS") (collectively, "Defendants").[2] In the first motion, Green Party seeks to reopen an action that it filed in 1998[3] ("the 1998 case") which was dismissed. Once reopened, it asks that the 1998 case be consolidated with the 2000 case. In the second motion, Defendants seek to have the 2000 case dismissed for lack of subject matter jurisdiction.

### I. *MOTION TO SET ASIDE ORDER AND TO CONSOLIDATE RE-OPENED CASE WITH PENDING CASE*

Green Party filed its Motion to Set Aside Order and to Consolidate Reopened Case with Pending Case ("Motion to Set Aside") on March 14, 2000. The crux of the Motion to Set Aside is a request that the order granting President Clinton and other defendants' (collectively "Defendants")[4] motion to dismiss[5] be set aside,

---

1. The case number is Civ. No. 00–166. Plaintiffs filed their First Amended Complaint on March 24, 2000.

2. The 2000 case is described in detail in Part III of this Order.

3. Civ. No. 98–232. The other plaintiffs in the 2000 case were not involved in this action.

4. Defendants named in the 1998 case, sued in their official capacities, were: President William Jefferson Clinton, Secretary of Defense William Cohen, then Secretary of the Navy John H. Dalton, and Secretary of Commerce

that the case be reopened, and that it be consolidated with the 2000 case. Green Party supplemented the Motion to Set Aside with filings submitted on March 16, 2000 ("First Supplement") and May 28, 2000 ("Second Supplement").[6] Defendants filed their opposition ("Opp.Mot. Set Aside") on May 26, 2000. Green Party filed its reply brief (Reply Mot. Set Aside) on June 2, 2000. Defendants filed their Response to the Second Supplement ("Resp. Second Supplement"), per leave of the Court, on June 6, 2000.

## A. The 1998 Case and its Dismissal

In February of 1998, the United States Department of Commerce via the NMFS, under the authority of the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.*, and the Marine Mammal Protection Act ("MMPA"), 16 U.S.C. § 1361 *et seq.*, issued a permit that allowed the United States Navy to conduct low-frequency active sonar tests and research ("sonar research") off the coast of the island of Hawaii. The Navy was performing the sonar research to both investigate the effectiveness of its Surface Towed Array Surveillance System Low Frequency Active ("SURTASS LFA") system and to test the potential effects of the SURTASS LFA system on whales. SURTASS LFA is a defense system that, if deployed, would be used to detect enemy submarines. *See* Mot. Dismiss 2000 Case at 1, 9 (describing SURTASS LFA technology). Phase III of the SURTASS LFA testing was to focus on the breeding and nursing behavior of whales. The sonar research was anticipated to last twenty-five to thirty days and was being conducted to gather information for the Environmental Impact Statement ("EIS") the Navy was (and is)[7] compiling on SURTASS LFA. *See id.* at 9–11.

Green Party filed its complaint in the 1998 case on March 18, 1998. An amended complaint was filed on March 20, 1998. Green Party claimed that Defendants violated the Permit by failing to suspend the SURTASS LFA testing when conditions arose[8] which the environmental assessment and/or permit identified as requiring suspension and/or termination of the sonar research. Green Party sought an injunction barring the Navy from continuing the Phase III SURTASS LFA testing and barring the NMFS from issuing permits to perform future SURTASS LFA testing in Hawaiian waters. The complaint also requested the Court to make various declarations of wrongdoing by Defendants because of their behavior regarding the permit and the Phase III testing. *See Hawaii County Green Party v. Clinton,* 14 F.Supp.2d 1198, 1199, 1202 (D.Haw.1998) ("*HCGP*").

After denying Green Party's motion for a temporary restraining order,[9] the Court held a hearing on Defendants' motion to dismiss the 1998 case and on Green Party's motion for declaratory relief and preliminary injunction. In an order filed August 7, 1998, the Court found Green Party's claims for relief moot and dismissed the action for lack of subject matter jurisdiction. The

---

William M. Bailey. Christopher W. Clark was also a defendant. Although some defendants in the 1998 and the 2000 cases are different, the Court refers to all as "Defendants." Furthermore, the Court notes that the Secretary of Commerce, from January of 1997 until the summer of 2000, was William M. *Daley.*

**5.** The order was filed and judgment entered August 7, 1998.

**6.** The Court granted Green Party leave to file this supplemental material in an order filed May 30, 2000.

**7.** The compilation of this EIS is the topic of the 2000 case. *See* Part II, *infra.*

**8.** Specifically, Green Party alleged that whales left the testing area in response to the tests and that this disruption of the breeding and calving of an endangered species violated the permit and various federal laws. *See* Mot. Set Aside at 4. Green Party also alleged trauma experienced by a human swimmer.

**9.** The Court denied the TRO in an order dated March 26, 1998.

Court first addressed Green Party's request for an injunction to revoke the permit for Phase III testing and to enjoin the NMFS from issuing future permits to allow SURTASS LFA research in Hawaiian waters. The Court found that Defendants had satisfied the "heavy burden" of proving mootness. *See id.* at 1201. The Court found that the Phase III research had been completed by the time of the hearing, that there were no plans to resume any sonar testing, and that Defendants lacked authority to resume testing because the permit had expired. *See id.* In short, the Court found that the activity underlying the claim for relief was complete, could not be undone, and was therefore moot. *See id.* at 1202. The Court dismissed the claims for declaratory relief as moot for the same reasons. *See id.* The Court rejected Green Party's argument that it should proceed to the merits of the case because there was a possibility that the Navy would recommence its research, finding that possibility too remote. *See id.* Finally, the Court held that the "capable of repetition, yet evading review" exception to mootness did not apply to save Green Party's case. The Court found that, because the permit had expired, there was no reasonable expectation that the SURTASS LFA testing would resume. The Court also found that the injury claimed was not so limited in duration that it "evaded" judicial review. *See id.* at 1202–03. The Court pointed to the fact that a TRO had been litigated on the merits and that by law future tests, if any, could occur only after Defendants went through a lengthy permit application process. *See id.*

**B. Green Party's Motion to Set Aside the Order Dismissing the 1998 Case**

In a motion filed on March 14, 2000, Green Party claims that the Navy intends to conduct further SURTASS LFA testing in the waters off Hawaii. *See* Mot. to Set Aside Order at 3. Relying on Fed.R.Civ.P. 60(b)(6), and arguing that this new information means that the grounds for declaring the 1998 case moot have "disappeared," Green Party asks the Court to reopen the 1998 case. *See id.* at 6.

**1. Green Party's Factual Allegations and Arguments**

Green Party does not allege that Defendants fraudulently changed position or hid their desire to do more testing from the Court in 1998. *See id.* at 8. Instead, Green Party alleges that Defendants "changed their position sometime after the dismissal of the [1998] case." *See id.* The new position is that the Navy will be conducting additional LFA testing as part of its research to prepare the EIS for eventual SURTASS LFA deployment. *See id.* at 3.

Green Party alleges that the Navy is conducting sonar tests in the marine environment of the type the Court found the Navy did not plan to do when it ruled the 1998 case moot. Green Party bases its allegations primarily on a television news broadcast and an email from a Navy researcher. The news broadcast stated that testing of SURTASS LFA would resume off the east coast of the United States during the summer of 2000. *See* Mot. Set Aside at 11. Green Party also presents an email written by Dr. Robert Gisiner of the Office of Naval Research. This letter states that "we are planning a study of sperm whales, probably in the Azores.[10]" *See* Ex. 1, Attachment B to Affidavit of Marsha Green, attached to Mot. Set Aside. Gisiner also discusses Dominica as a possible site for testing. Gisiner then states, "If we went back to Hawaii to follow up on the humpback work I might want to try to get some 160–180 dB exposures if other interested parties like you agreed...." *Id.* Green Party emphasizes that this future

---

10. The Court notes that the Azores are a group of islands in the middle of the Atlantic ocean.

testing in Hawaii would be at greater intensity levels than the tests performed in 1998, making the tests more harmful to both whales and any humans who might be in the water. *See* Mot. Set Aside at 4–5. Green Party also avers that the new tests would target additional types of whales. *See id.* at 5. Green Party then points to the Navy's performance of Littoral Warfare Advanced Development ("LWAD")[11] testing as additional evidence that the Navy is conducting sonar research tests in the marine environment of the type the Court found the Navy did not plan to do when it ruled the 1998 case moot. *See* Second Supplement at 4, 6, 9. Green Party alleges that all this testing is a continuation of the Phase III testing which Defendants had supposedly completed when the 1998 case was found moot. *See* Mot. Set Aside at 3.

Green Party argues that the Court should not be persuaded by Defendants' attempts to separate this new activity from that which was the subject of the 1998 case. *See* Reply Mot. Set Aside at 2. It alleges that the 1998 dismissal order "obviously reached beyond the confines of Phase III research using the SURTASS LFA system" and was premised on the entire Scientific Research Program (of which Phase III was just one part of research for the EIS) being completed. *See* id. at 3. Green Party further argues that the new testing by the Navy, whether SURTASS LFA testing or not, is sufficiently "connected" to the SURTASS LFA testing that it supports reopening the case. *See id.* at 6. Green Party also contends that the Court should disregard Defendants' claims that no testing is planned at

this time because these claims were made only after the instant motion was filed and are contradicted by the Gisiner email. *See id.* at 5. It accuses Defendants of playing a "cat-and-mouse game" with it and the Court. *See id.*

Green Party urges the Court to reopen the 1998 Case because the above allegations show that the grounds for declaring the case moot have disappeared. It argues that the instant circumstances are extraordinary.

Green Party also argues that setting aside the dismissal order is necessary to accomplish justice. It contends that while granting the motion would not prejudice Defendants, it will be injured if the Court denies its motion. First, Green Party argues that if it has to wait to file an action until the Navy actually resumes testing in Hawaii it will not have enough time to gather evidence to effectively challenge the testing before it is completed. *See* Mot. Set Aside at 17. Second, Green Party argues that it will be injured if the 1998 case is not reopened because there is a risk that the Navy will resume testing without going through the lengthy permit application process, the length of which was one of the reasons the Court in 1998 found the case not "capable of repetition yet evading review." *See HCGP*, 14 F.Supp.2d at 1202.[12] For example, it argues that if the Navy conducts future tests in the Exclusive Economic Zone ("EEZ") of a foreign nation (i.e., the EEZ of Portugal if testing is done in the Azores), the Navy may not have to apply for a permit prior to testing, thereby robbing Plaintiffs of their advance notice time in which to challenge the permit. *See id.* at 18–19.[13]

---

**11.** The LWAD testing was done off the coast of the Bahamas. More LWAD testing was planned for areas off coast of New Jersey, but the sonar research aspects of the tests have been canceled. *See* Second Supplement at 2–3; *The Honolulu Advertiser*, A4 (May 27, 2000).

**12.** In its order finding the 1998 case moot, the Court noted that the mootness exception for actions "capable of repetition yet evading review" did not apply because, *inter alia*,

"prior to the initiation of any future tests upon endangered species and the marine environment ... Defendants would have to apply to the NMFS for a new research permit." *HCGP*, 14 F.Supp.2d at 1202. The Court explained that this process would include a 30 day public review period which was ample time for judicial review.

**13.** Green Party states that there is uncertainty about whether or not a permit is required for testing done in the EEZ of foreign nations.

Additionally, Green Party argues that the way LWAD testing came about (without a permit) shows that the Court's presumption that future testing would only occur after a lengthy permit application process (making challenges to SURTASS LFA testing not "capable of repetition yet evading review") was faulty. *See* Second Supplement at 3.

Finally, Green Party contends that the fact that the grounds upon which the 1998 case became moot are no longer true means that justice is not served by preserving the finality of the dismissal order. *See id.* at 19–20.

### 2. Defendants' Factual Allegations and Arguments

In response to the Motion to Set Aside, Defendants make two arguments. First, they argue that even if Green Party's claim that "the entire basis for the dismissal as moot no longer exists" is correct, the instant situation does not meet the "extraordinary circumstances" test necessary to reopen a case under Rule 60(b)(6). Defendants argue that there is no authority for Green Party's position that Rule 60(b)(6) supports reopening the 1998 case. They also argue that Green Party can accomplish justice through the 2000 case (or another new case) and does not need the 1998 case reopened.

Second, Defendants argue that Green Party's factual assertion that "the entire basis for the dismissal as moot no longer exists" is incorrect. Defendants deny that they plan to resume testing of SURTASS LFA in Hawaii or elsewhere until the EIS process on SURTASS LFA is complete. *See* Opp.Mot. Set Aside at 7–8; *see also* Mot.Dis., Ex. 4 (Declaration of Joseph S. Johnson). Defendants also deny that the Navy is using or planning to use SURTASS LFA operationally prior to the EIS process for SURTASS LFA being completed. *See* Mot.Dis., Ex. 12 (Declaration

Green Party claims that either interpretation supports its claim to reopen the 1998 case.

of Marshall N. Millard). Defendants then explain that Green Party makes too much of the Gisiner email. First, they explain that the email states that going back to Hawaii to perform tests is only an "if," conditioned on the very-unlikely "if" of obtaining agreement from "other interested parties," i.e., conservation groups. Moreover, they allege that the email was discussing a different type of low frequency research from the SURTASS LFA system tested in Phase III. *See* Declaration of Gisiner, attached to Opp.Mot. Set Aside, ¶ 3 ("Any inference from my e-mail message that the Navy was considering using SURTASS LFA as part of this proposed research is wrong."). Furthermore, Defendants argue that the research Gisiner mentioned was only in the discussion stage, has yet to be approved, and will not be carried out this year. *See* Opp.Mot. Set Aside at 8 (citing Gisiner declaration). Defendants emphasize that no applications for permits to test SURTASS LFA are pending.

Defendants also challenge the relevance of Green Party's evidence on LWAD and other sonar testing. They argue that the 1998 case did not seek to enjoin any and all use of underwater acoustic technology by the Navy anywhere in the world. *See* Resp. Second Supplement at 4. Instead, Defendants maintain that all Green Party asked for was an injunction to stop a specific portion of SURTASS LFA research (i.e., Phase III of SURTASS LFA sonar testing in Hawaii). Accordingly, Defendants argue that LWAD testing is irrelevant to the 1998 case.

### C. Relief From Judgment Under Fed. R.Civ.P. 60(b)(6)

The Federal Rules of Civil Procedure allow for parties to move for relief from judgment in certain circumstances:

*See* First Supplement.

On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) *any other reason justifying relief from the operation of the judgment.* The motion shall be made within a reasonable time[.]

Fed.R.Civ.P. 60(b) (emphasis added). A party may seek relief under Rule 60(b)(6) if the motion is made within a reasonable time [14] and is not premised on one of the grounds for relief enumerated in clauses (b)(1) through (b)(5). *See Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988). Courts have "broad authority" to grant relief under Rule 60(b)(6). *See id.* Green Party maintains that the first five subparts of Rule 60(b) do not apply to the instant situation. *See* Mot. Set Aside at 7–9. Defendants do not contest this and the Court agrees. Thus, Green Party must establish its entitlement to relief from judgment under in the catchall provision of Rule 60(b)(6).

 Relief under Rule 60(b)(6) is available only in "extraordinary circumstances." *Ackermann v. United States*, 340 U.S. 193, 199, 71 S.Ct. 209, 95 L.Ed. 207 (1950). The Rule gives courts authority to vacate judgments whenever such action is appropriate to accomplish justice. *See Liljeberg*, 486 U.S. at 863–64, 108 S.Ct. 2194; *Maraziti v. Thorpe*, 52 F.3d 252, 254 (9th Cir.1995). The Rule 60(b)(6) motion "has been used *sparingly* as an equitable remedy to prevent manifest injustice." *United States v. Alpine Land & Reservoir, Co.*, 984 F.2d 1047, 1049 (9th Cir.1993) (emphasis added). "The rule is to be utilized only where extraordinary circumstances prevented a party from taking timely action to prevent or correct an erroneous judgment." *Id.* The Ninth Circuit emphasized that relief under Rule 60(b)(6) "normally will not be granted unless the moving party is able to show both injury and that circumstances beyond its control prevented timely action to protect its interests." *Id.* (reversing and remanding the granting of a Rule 60(b)(6) motion). As another Ninth Circuit judge explained, "Rule 60(b)(6) authorizes setting aside a judgment only for reasons that would have prevented entry of the judgment in the first place, had the reasons been known at the time judgment was entered." *United States v. Washington*, 98 F.3d 1159, 1164 (9th Cir.1996) (Kozinski, J., concurring). The denial of a Rule 60(b) motion is reviewed for abuse of discretion. *See Maraziti*, 52 F.3d at 253.

## D. Green Party's Motion to Set Aside is Denied

The Court denies Green Party's Motion to Set Aside. First, even if there are "changed circumstances" such that the reasons for finding the 1998 case moot no longer exist, this does not warrant the extraordinary remedy of setting aside judgment under Rule 60(b)(6). Second, the Court is not convinced, from the record before it, that there truly are changed circumstances.

---

**14.** Although nearly two years have passed since the dismissal order, the timeliness of Green Party's motion is not in dispute. *See* Mot. Set Aside at 10–12 (arguing timeliness and that the motion was filed as soon as the new Navy testing became known to Green Party). Defendants do not contest the timeliness of the motion and accordingly, the Court will not analyze this issue.

### 1. There is No Authority For Green Party's Request to use Rule 60(b)(6) to Reopen a Case Held Moot Because the Mootness Decision Would Come Out Differently Under New Circumstances

■ The Court finds that Green Party is not entitled to relief under Rule 60(b)(6) even if the Court accepts as true that Defendants intend to resume (or have resumed) the testing challenged in the 1998 case. Green Party has not produced any authority for its thesis that Rule 60(b)(6) may be used to reopen a case held moot because the mootness decision would come out differently under new circumstances.

Green Party does not satisfy the stringent standards for relief under Rule 60(b)(6). First, it has not shown extraordinary circumstances. It can hardly be "extraordinary" in an ever-changing world that years after a case is found moot, facts arise that would support a new lawsuit or even (arguably) the claims rejected in the first lawsuit. If such a change in circumstances meant that final judgments should be disturbed, Rule 60(b)(6) motions would not be used "sparingly," but would be used routinely by parties trying to re-open moot cases years after-the-fact. The Court cannot reach such a conclusion.

Next, Green Party cannot show any facts that prevented it from taking timely action to prevent or correct an erroneous judgment. Green Party does not allege that Defendants committed a fraud on the Court when they represented in 1998 that their testing was completed and the permit expired. *See* Mot. Set Aside at 8. Instead, all the facts that Green Party relies on to request the re-opening of the case arose subsequently to the 1998 case being dismissed. Accordingly, nothing Defendants did kept Green Party from preventing or correcting an erroneous judgment because there was no erroneous judgment to correct or prevent.

Nor has Green Party brought forth "reasons that would have prevented entry of the judgment in the first place, had the reasons been known at the time judgment was entered." *United States v. Washington*, 98 F.3d at 1164. Green Party has only alleged new facts, i.e., facts that arose subsequent to the 1998 case's dismissal. Reasons that did not exist at the time could not have prevented judgment nor been known by any party. The soundness of the judgment is not affected and judgment should not be reopened.

Moreover, Green Party has not shown that the remedy it seeks is necessary to accomplish justice or to avoid manifest injustice. Green Party suffers no injury if this motion is denied. If new facts have truly emerged which show Defendants are violating the law, Green Party can sue anew. Green Party has not contested that it could do so. In the hearing, Green Party said that it wanted to reopen the case to take advantage of the record developed in the 1998 case. Yet, Green Party does not explain why the evidence from 1998, if relevant, could not be re-submitted in a new case. In short, Green Party does not need the remedy under 60(b)(6) to obtain relief of Defendants' allegedly wrongful actions. Going through the cumbersome process of trying to re-open a dusty case through a remedy that is to be used "sparingly" can hardly be easier than just filing a new complaint. In fact, Green Party has filed a new complaint—Civil No. 00–166 ACK. In this complaint Green Party (and other plaintiffs) are suing many of the same Defendants for violating environmental laws. Green Party has not shown any reason that it cannot obtain the relief it seeks through this (or another) new suit.

Additionally, the Court is not persuaded by Green Party's various claims of "injury." First, Green Party argues that it will be injured by a denial of the motion because it was denied injunctive relief in 1998 to stop Defendants from testing SURTASS LFA and Defendants are testing again. *See* Mot. Set Aside at 16. This argument presupposes that the only way for Green Party to get injunctive relief

now is to reopen the 1998 case. This argument ignores the obvious: Green Party can file a new complaint and request a new injunction.

Green Party also alleges that it will be injured if it cannot re-open this case because then it will have to file a TRO and will not be able to obtain sufficient evidence in the brief TRO time frame so as to make out its case. *See id.* at 17. The Court is not persuaded. First, the Court specifically held that the merits review which occurred during the TRO meant Defendants were not "evading review." *See HCGP*, 14 F.Supp.2d at 1202. Second, this argument ignores the fact that a TRO would be required whether the 1998 case is reopened, or a new case filed, if Green Party wants to immediately enjoin some practice by Defendants. Third, this argument does not explain why reopening the 1998 case is warranted and a new case cannot be filed. Green Party can readily re-submit any evidence from the 1998 case in a new case. Moreover, if Green Party does not have a cognizable claim with which to file a new complaint, then it obviously does not have a cognizable need to reopen the 1998 case. Green Party argues that circumstances have changed warranting the reopening of the 1998 case; these same reasons should be enough to file a new complaint.

Next, Green Party alleges that it will be injured because there is a risk that Defendants will conduct its tests without first applying for permits in the EEZ's of foreign nations where permits (and therefore the 30 days permit application period) are not required. *See id.* at 18. The Court will not find "injury" in Green Party's speculation that Defendants might possibly test at unknown points in the future without obtaining permits. Furthermore, this argument does not explain why reopening the 1998 case is warranted and a new case cannot be filed to prevent this "injury." Quite simply, Green Party shows no injury.

Finally, the Court notes that Green Party's claims of injury are obviated by the stipulation made at the hearing on June 13, 2000. At the hearing, the parties stipulated (with the exception that the stipulation will be revisited if national security so dictates) that there will be no SURTASS LFA testing or deployment around the Hawaiian Islands until after the OEIS and EIS process is complete, they have been approved, and the Notice of Record of Decision is published for 30 days in the Federal Register. This will provide Green Party and others with an opportunity to file legal challenges prior to deployment. *See* Tr. of June 13, 2000 Hr'g at 17–18, 43–44. Thus, if the Navy does plan to resume testing in Hawaii, Green Party will have sufficient time in which to file a new lawsuit to stop the testing. It is not injured by its inability to resurrect the 1998 case.

The Court rejects Green Party's assertion that *U.S. Bancorp Mortgage Co. v. Bonner Mall Partnership*, 513 U.S. 18, 25, 29, 115 S.Ct. 386, 130 L.Ed.2d 233 (1994), provides authority for its position. *U.S. Bancorp* discussed the circumstances under which an appellate court should vacate a lower court judgment decided on the merits that was not reviewed on appeal because the pending appeal became moot. *See id.* That is not the situation here. The instant case asks whether a case found moot in the district court can be reopened if the mootness decision would come out differently under new circumstances. *U.S. Bancorp* is inapplicable.

The Court is also unpersuaded by Green Party's reference to the State of Washington's "substantial public interest" exception to mootness. *See* Mot. Set Aside at 20 n. 7; *Hart v. Department of Soc. & Health Servs.*, 111 Wash.2d 445, 759 P.2d 1206, 1207–08 (1988). *Hart* discusses an exception that allows appellate courts to review judgments of cases decided on the merits in trial court which become moot pending appeal. The doctrine is clearly inapplicable here.

For all the aforementioned reasons, the Court finds that Green Party has not shown that relief under Rule 60(b)(6) is appropriate to reopen a case once found moot because the mootness decision would come out differently under new circumstances. Green Party's motion to set aside is DENIED.

**2. The Court Does Not Find That New Facts Have Occurred That, If They Had Been in Existence Earlier, Would Have Precluded a Finding of Mootness**

Alternatively, even if the Court held that it may be appropriate under Rule 60(b)(6) to reopen a case held moot because the mootness decision would come out differently under new circumstances, the Court finds this is not such a case. The Court is not convinced, from the record before it, that there truly are changed circumstances.

The Court granted Defendants' motion to dismiss the 1998 case because of mootness. Green Party requested an injunction to keep the Navy from conducting Phase III research. *See HCGP,* 14 F.Supp.2d at 1201. The Court found that the Phase III research had been completed by the time of the hearing, that there were no plans to resume SURTASS LFA testing, and that Defendants lacked authority to resume testing because the permit had expired. *See id.* Because the Court found that the activity underlying the claim for relief was complete, it found the issue moot. *See id.* at 1202. The Court dismissed the claim for declaratory relief as moot for the same reasons. *See id.*

 Green Party has not submitted credible evidence that new facts exist that, had they existed earlier, would have undermined the reasons underlying the Court's holding of mootness (i.e., Phase III testing being completed, expiration of the permit, and the Court's inability to give effective relief on the declaratory requests because of the first two facts). *See id.* at

1201–02. Green Party's evidence of changed circumstances is very weak. Its evidence that testing is to resume in Hawaii consists of a news report and an email discussing testing in the Caribbean Sea and Atlantic Ocean. Testing in Hawaii is, at best, an "if." *See* Ex. 1, Attachment B to Affidavit of Marsha Green, attached to Mot. Set Aside. The email certainly discusses sonar research being done by the Navy, but does not establish that it is the same research that Green Party sought to enjoin and have declared illegal in the 1998 case. The injunction Green Party sought was to cease the Phase III testing and to revoke the permit under which the testing was being done. Green Party's evidence does not show that Phase III tests or the permit at issue in the 1998 have resumed.

Additionally, Defendants have presented evidence that no testing is planned of the type Green Party sought to enjoin in the 1998 case. Defendants deny that they plan to resume testing of SURTASS LFA in Hawaii or elsewhere until the EIS process on SURTASS LFA is complete. Defendants also deny that the Navy is using or planning to use SURTASS LFA operationally prior to the EIS process for SURTASS LFA being completed. Moreover, Defendants deny that any permits are being sought for SURTASS LFA testing. Finally, at the hearing the parties stipulated to this effect. *See* discussion, *supra.* Green Party does not effectively challenge these direct denials with the "If we went back to Hawaii …" (emphasis added) quote from Gisiner's email. Green Party's admonishment that the Court should not consider the Navy's statements made after its motion was filed is unpersuasive.

The Court agrees with Defendants' more narrow reading of both the Court's order dismissing the 1998 case and Green Party's requests in that case. What Green Party sought in the 1998 case was "a permanent injunction prohibiting any further testing under the Permit." *See* complaint at 6. It also sought declaratory relief regarding certain Defendants' behavior re-

garding the permit. The requested injunction and declaratory relief were not granted because the case became moot. Green Party did not challenge any and all use of underwater acoustic technology by the Navy anywhere in the world. *See* Resp. Second Supplement at 4. Green Party has submitted no convincing evidence that new facts have occurred that, if they had been in existence earlier, would have precluded a finding of mootness. The Court finds that Defendants have no plan to resume testing of SURTASS LFA in Hawaii or elsewhere at this time. No permits to allow SURTASS LFA testing are pending. At best, Green Party's facts show that there might be testing in Hawaii at some undisclosed point in the future. This has always been a possibility, but one that the Court found "too remote" to preclude a finding of mootness in 1998. *See* *HCGP*, 14 F.Supp.2d at 1202. Accordingly, the Court finds that no new facts have occurred that, if they had been in existence earlier, would have precluded a finding of mootness. Green Party's motion to set aside judgment is DENIED.

Because the Court denied Green Party's motion to set aside dismissal of the 1998 case, the motion to consolidate is moot. The motion is DENIED.

## II. *MOTION TO DISMISS*

Plaintiffs [15] (including, but not limited to Green Party) filed their complaint in the 2000 case on February 29, 2000. Their First Amended Complaint (hereinafter, "the complaint" unless otherwise noted) was filed on March 24, 2000. Plaintiffs seek declaratory relief and preliminary and permanent injunctions against the Navy and the NMFS. Plaintiffs challenge

the adequacy of the process of the Navy's compilation of an EIS on the potential environmental effects of operational deployment of SURTASS LFA. The crux of the complaint is that the Navy has made and continues to make massive irreversible and irretrievable commitments of resources to the development and deployment of low frequency active sonar systems without preparing a final EIS. *See* Opp.Mot.Dis. at 2. Plaintiffs also challenge the Navy's pending application for a Letter of Authorization with the NMFS to authorize incidental, unintentional harassment of marine wildlife under the Marine Mammal Protection Act.

Defendants [16] filed a motion to dismiss on March 30, 2000 ("Mot.Dis."). The motion challenges Plaintiffs' subject matter jurisdiction, alleging a lack of notice, ripeness, and standing. Plaintiffs filed their opposition on May 25, 2000 ("Opp.Mot.Dis."). Defendants filed their reply memorandum on June 2, 2000 ("Rep. Mot.Dis.").

### A. Statutory Framework

Plaintiffs allege harms done under three statutes in connection with the development and possible future deployments of SURTASS LFA: the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*, the Endangered Species Act, 16 U.S.C. §§ 1531 *et seq.*, and the Marine Mammal Protection Act, 16 U.S.C. § 1361 *et seq.*

First, Plaintiffs allege that the Navy violated the National Environmental Policy Act ("NEPA"). Congress enacted NEPA to ensure that federal agencies consider environmental factors before taking ac-

---

**15.** Plaintiffs are: Hawaii County Green Party; Julie Jacobson, a member of the Hawaii County Council; Ocean Mammal Institute; Animal Welfare Institute; Sea Shepherd Conservation Society; The Stop LFAS Worldwide Network; The Silent Oceans Trust, Inc.; Kohanaiki 'Ohana; Universal Cetacean Institute; Orca Quest; and Whale Rescue Team.

**16.** Defendants are all sued in their official capacities: President William Jefferson Clinton, Secretary of Defense William Cohen, Secretary of the Navy Richard Danzig, Secretary of Commerce William Daley, NMFS Assistant Administrator for Fisheries Penelope Dalton, NMFS Director, Office of Protected Resources, Donald Nowles, and NMFS Chief, Marine Mammal Conservation Division, Donne Weiting.

tions "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). Agencies may comply with NEPA either by preparing a full-blown EIS (if the project is likely to have significant environmental effects) or by making a finding of no significant impact (if the project is not likely to have significant environmental effects). There are also categorical exclusions to the EIS requirement. *See* 40 C.F.R. §§ 1501.4, 1508.4, 1508.13. The Council on Environmental Quality ("CEQ") promulgates regulations which provide guidance for compliance with NEPA. *See* 40 C.F.R. § 1500 *et seq.*

The purpose of an EIS is to "insure that the policies and goals defined in [NEPA] are infused into the ongoing programs and actions of the Federal Government." 40 C.F.R. § 1502.1. An EIS "shall be supported by evidence that the agency has made the necessary environmental analyses[,]" as an EIS is intended to be "used by Federal officials in conjunction with other relevant material to plan actions and make decisions." *Id.* Where there is a lack of evidence in a particular area, the agency is required to obtain the missing information.

> If the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant, the agency shall include the information in the environmental impact statement.

40 C.F.R. § 1502.22(a). This section has been interpreted to mean that an agency is required to engage in reasonable research to supply missing information about the negative impacts that a project may produce. *See Warm Springs Dam Task Force v. Gribble*, 621 F.2d 1017, 1025 (9th Cir.1980) (failure to discuss the danger of the proposed action in an EIS violated NEPA, but the violation was cured when

defendants engaged in an extensive ten month study that addressed the concerns of the plaintiffs).[17]

Second, Plaintiffs allege that the Navy and the NMFS violated the Endangered Species Act ("ESA"). The ESA "provide[s] a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved [and] provide[s] a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). . The ESA prohibits federal agencies from taking any action that is likely to "jeopardize the continued existence of any endangered or threatened species ... unless such agency has been granted an exemption for such action." 16 U.S.C. § 1536(a)(2). The ESA requires the action agency to consult with the U.S. Fish and Wildlife Service ("FWS") or the NMFS whenever a federal action "may affect" an endangered or threatened species. 50 C.F.R. § 402.14(a). The "taking" of any endangered or threatened species, including humpback and sperm whales, is specifically prohibited. *See* 16 U.S.C. § 1538(a)(1)(B). "Take" means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture or collect" or to attempt to engage in such conduct. 16 U.S.C. § 1532(19). However, if an agency action will not likely jeopardize the continued existence of a species, and if the taking is allowable under the Marine Mammal Protection Act, then an incidental take statement will be issued. *See* 16 U.S.C. § 1536(b)(4). Finally, pursuant to the ESA, agencies may not make "any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures." 16 U.S.C. § 1536(d). Although the federal government primarily enforces and implements the ESA, private citizens

---

**17.** *See also Ocean Mammal Institute v. Cohen* at 12, Civ. No. 98–160 HG (D.Haw. Mar. 9, 1998) (Gillmor, J.) (same).

may also file suit to enforce the Act. *See* 16 U.S.C. 1540(g)(1)(A).

Third, Plaintiffs allege violations of the Marine Mammal Protection Act ("MMPA"). Congress enacted the MMPA to prevent the extinction or depletion of marine mammal stocks caused by human activities. 16 U.S.C. § 1361(1). The MMPA prohibits taking marine mammals unless the Act specifically authorizes such a taking, 16 U.S.C. § 1372(a)(1), or unless the NMFS has authorized a limited, incidental taking. The MMPA does not authorize citizen suits. *Didrickson v. U.S. Dep't of the Interior,* 982 F.2d 1332, 1338 (9th Cir.1992). Citizens challenging actions done under the MMPA must sue under the Administrative Procedure Act, 5 U.S.C. § 704 ("APA").

### B. The Complaint

Plaintiffs challenge the Navy's ongoing preparation of an EIS for the operational deployment of the SURTASS LFA system. Their central allegation is that the Navy has made and continues to make massive irreversible and irretrievable commitments of resources to the development and deployment of SURTASS LFA without preparing the final EIS, effectively foreclosing the option to not deploy SURTASS LFA. *See* Opp.Mot.Dis. at 2. The remainder of their allegations essentially claim that these illegal commitments compromise the integrity of the regulatory process and violate federal environmental laws. *See id.*

### 1. Plaintiffs' Causes of Action

In Count I, Plaintiffs allege that the Navy has violated NEPA by irreversibly and irretrievably committing resources toward the deployment of SURTASS LFA prior to completing the required EIS. *See* Compl. ¶ 21, 24. Specifically, they complain that while the EIS process has been pending, the Navy has expended more than $350 million on building a ship to house and deploy the system, assembly of the sonar system, integration, testing, technical manuals, and engineering support.

In Count II, Plaintiffs claim a lack of objectivity and sufficiency in the NEPA process and the draft EIS. Plaintiffs claim that the Navy, *inter alia,* ignored concerns about potential environmental impact of the SURTASS LFA system on marine mammals, refused to hear presentations regarding adverse environmental impacts, ignored hard evidence about adverse effects of testing, misrepresented the actual evidence being discussed, and failed to include in its draft EIS the required statements of irreversible and irretrievable commitments and alternatives to SURTASS LFA.

Count III alleges that the NMFS and the Secretary of Commerce failed to properly administer and enforce the law by allowing NMFS personnel to assist in production of the draft EIS. It also alleges impropriety in the NMFS accepting and processing the application (based on the draft EIS) for a Letter of Authorization [18] to "take" protected species.

Count IV alleges that the MMPA was violated when the Navy conducted SURTASS LFA tests in international waters without seeking required permits. It also alleges that the Navy conducted other sonar and acoustic tests (including LWAD testing and high frequency sonar testing) in March of 2000 without consulting the NMFS.

Count V alleges a violation of the ESA through the Navy's performance of LFA tests in international waters without seeking required permits.

Count VI alleges a violation of the ESA via the Navy's irreversible and irretrievable commitments to the deployment of SURTASS LFA before completion of the

---

**18.** The application asks the NMFS to issue a letter of authorization allowing incidental taking of marine animals during a five years

deployment of the SURTASS LFA technology. *See* Mot.Dis.Ex. 6.

EIS. It alleges that the Navy has done nothing to come into compliance with the ESA despite receiving notice from Plaintiffs' attorney Lanny Sinkin of its alleged violations.

Count VII alleges a violation of the ESA because the Secretary of Commerce ignored and colluded in the Navy's violations of the ESA. It alleges that the Secretary did nothing to stop the NMFS from processing the Letter of Authorization after receiving notice from Sinkin of alleged violations of the ESA by the Navy (and the NMFS's collusion in those violations).

### 2. Plaintiffs' Alleged Harm

Plaintiffs claim harm from the above actions. They allege, *inter alia,* that they and/or their members, because of their interests in the ocean and/or ocean life, will be harmed by a decision to deploy a system harmful to marine life and the marine environment that was reached by violating NEPA procedures. They allege that they are harmed by a decision making process that lacks objectivity and that is conducted in bad faith. Plaintiffs also claim harm to their members who have been frustrated in attempts to show the Navy that there is a "no action alternative," i.e., an option to not deploy SURTASS LFA. Finally, they claim harm from the Navy's performance of LFA tests in international waters without seeking required permits. *See* Compl. ¶¶ 80–85.

### 3. Plaintiffs' Requested Relief

Plaintiffs ask the Court for numerous declarations of illegality by Defendants. *See* Compl. at 23–27.

They also ask the Court to enjoin certain behavior by Defendants. First, Plaintiffs seek an injunction prohibiting the Navy from continuing to expend irretrievable resources and make irretrievable commitments to developing SURTASS LFA until the EIS and this Court's review of the EIS are complete and all necessary permits are obtained. *See* Compl. at 3 & 27. They also want the Court to enjoin

the deployment of SURTASS LFA until a satisfactory EIS is issued. *See* Compl. at 27. Furthermore, Plaintiffs want the Court to direct the Navy to retain an independent contractor to determine whether legitimacy can be restored to the EIS process. *See id.* at 3 & 28

Plaintiffs also want the Court to order the Commerce Department to order the NMFS to dismiss the Navy's application for the Letter of Authorization. Alternatively, Plaintiffs ask the Court to order the Commerce Department to order the NMFS to cease processing of the application until the Navy is in compliance with NEPA and the ESA, the EIS for SURTASS LFA is complete, and this Court finds the completed EIS adequate. *See id.*

Finally, Plaintiffs seek an injunction prohibiting the Navy from conducting LFA tests in international waters without the permits required by law. *See id.* at 3–4 & 27–28.

### C. The Motion to Dismiss

Defendants argue that the 2000 case should be dismissed in its entirety for lack of subject matter jurisdiction. First, as to the claims under the ESA (Counts V, VI, and VII), they argue that Plaintiffs did not comply with the notice requirements that are a precondition to suit. Second, they argue that Plaintiffs lack standing as to all claims. Third, they argue that Plaintiffs' claims are not yet ripe for judicial review because they challenge ongoing agency action.

Plaintiffs categorically deny all of Defendants arguments. They insist that Defendants ignore their central allegation, namely that the Navy has made irreversible and irretrievable commitment of resources before a final EIS is issued. They argue that they have met the notice requirements of the ESA and, alternatively, that the APA is the basis for counts V, VI, and VII, making the notice requirement inapplicable. Plaintiffs also argue that they have standing because they have al-

leged redressable concrete injuries caused by Defendants' actions. Finally, Plaintiffs insist that their claims are ripe.

### 1. Standard of Review

"A party invoking the federal court's jurisdiction has the burden of proving the actual existence of subject matter jurisdiction." *See Thompson v. McCombe,* 99 F.3d 352, 353 (9th Cir.1996). On a Rule 12(b)(1) motion, the court is not "restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction." *McCarthy v. United States,* 850 F.2d 558, 560 (9th Cir.1988). "The requirement that the nonmoving party present evidence outside his pleadings in opposition to a motion to dismiss for lack of subject matter jurisdiction is the same as that required under Rule 56(e) that the nonmoving party to a motion for summary judgment must set forth specific facts, beyond his pleadings, to show that a genuine issue of material fact exists." *Trentacosta v. Frontier Pac. Aircraft Indus., Inc.,* 813 F.2d 1553, 1559 (9th Cir.1987); *see also Biotics Research Corp. v. Heckler,* 710 F.2d 1375, 1379 (9th Cir.1983) (noting that the district court may receive evidence to resolve underlying factual disputes in a 12(b)(1) motion to dismiss for lack of subject matter jurisdiction).

The district court's dismissal for lack of subject matter jurisdiction is reviewed de novo. *See Seven Resorts, Inc. v. Cantlen,* 57 F.3d 771, 772 (9th Cir.1995). Any factual determinations made by the district court in ruling on the motion to dismiss are reviewed for clear error. *See Nike, Inc. v. Comercial Iberica de Exclusivas Deportivas, S.A.,* 20 F.3d 987, 990 (9th Cir.1994).

### 2. The ESA's Sixty Day Notice Requirement

Defendants claim that Plaintiffs did not comply with the notice requirements for their claims under the ESA (Counts V, VI, and VII) and therefore, these claims should be dismissed. Plaintiffs argue that (1) they can also bring these claims under the APA, making the notice requirement inapplicable, and (2) they have met the notice requirement.

Citizens may enforce the ESA through private suits "to enjoin any person, including the United States and any other governmental instrumentality or agency ... who is alleged to be in violation of any provision of [the ESA] or regulation issued under the authority thereof." *See* 16 U.S.C. § 1540(g)(1)(A). Suit under § 1540(g)(1)(A) may not be commenced "prior to 60 days after written notice has been given to the Secretary, and to any alleged violator of such provision." *See* 16 U.S.C. § 1540(g)(2)(A). "[C]ompliance with the 60–day notice provision is a mandatory, not optional, condition precedent to suit." *See Hallstrom v. Tillamook County,* 493 U.S. 20, 23 & n. 1, 26, 110 S.Ct. 304, 107 L.Ed.2d 237 (1989) (construing strictly a provision in the Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6972, which the Supreme Court noted is similar to 16 U.S.C. § 1540(g)(2)). The purpose of foreclosing suits based on such a statute prior to the satisfaction of the notice provision is to balance the interest in encouraging citizen enforcement actions with the interest in avoiding federal courts overly burdened with such suits. *See id.* at 29, 110 S.Ct. 304. The notice requirement also allows the agency responsible for enforcement of the statute to take appropriate enforcement action and/or come into compliance prior to litigation commencing. *See id.* at 26, 110 S.Ct. 304. The citizen suit notice requirements cannot be avoided by employing a flexible or pragmatic construction and the suit must be dismissed if Plaintiffs have not strictly complied with the notice requirements. *See id.* at 26, 110 S.Ct. 304; *see also Southwest Ctr. For Biological Diversity v. U.S. Bureau of Reclamation,* 143 F.3d 515, 520 (9th Cir.1998) (citing numerous cases stating that courts should be strict in their

interpretation of the 60 day rule as an absolute bar to suit).

■■■■ The Court will first address Plaintiffs' argument that their ESA claims (counts V, VI, and VII) could be brought under the APA, making the 60 day notice rule inapplicable. The Court concludes that a particular claim may only be brought under either the APA or the ESA—a plaintiff may not chose her statutory weapon. A rule that allowed a plaintiff to choose between bringing a claim under the APA or the ESA would allow plaintiffs to circumvent the 60 day notice requirements of the ESA. "[T]he APA does not provide an avenue for duplicative review when a statute specifically sets out procedures for review of agency action." *American Canoe Ass'n, Inc. v. United States Environmental Protection Agency,* 30 F.Supp.2d 908, 927 (E.D.Va.1998) (holding that review of claims of ESA violations is not available under the APA since the ESA expressly provides an adequate remedy for plaintiffs' claims through its citizen suit provision). Furthermore, any other rule would be inconsistent with the judicial review language of the APA, 5 U.S.C. § 704 ("Agency action made reviewable by statute and final agency action *for which there is no other adequate remedy in a court* are subject to judicial review.") (emphasis added); *see also Bennett v. Spear,* 520 U.S. 154, 161–62, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (same). Quite simply, if there is a remedy under the ESA, then action under the APA is not allowable.

■■■■ The next question is whether Plaintiffs' claims are properly brought under the citizen suit provisions of the ESA or the APA. Count VII alleges that the Secretary of Commerce did not administer the ESA properly. Claims that the Secretary maladministered the ESA cannot be brought under 16 U.S.C. § 1540(g)(1)(A) because those claims do not state "violations" of the ESA. *See Bennett,* 520 U.S. at 173–74, 117 S.Ct. 1154. Such claims are properly brought instead under the APA. *See id.* Accordingly, Claim VII is not

subject to the 60 day notice requirement of the ESA.

Claims to enjoin someone other than the Secretary of Commerce for violations of the ESA, however, are properly brought under 16 U.S.C. § 1540(g)(1)(A). Counts V and VI allege violations of the ESA by the Navy. Thus, the 60 day notice requirement applies to Counts V and VI.

The Court finds that Plaintiffs did not meet the 60–day notice requirement prescribed by the ESA and Counts V and VI must be dismissed. Plaintiffs sent official notice via email to the Navy and the Commerce Department on January 14, 2000. This notice alleged that the Navy was making irreversible and irretrievable commitments of resources to SURTASS LFA deployment. It also complained about the NMFS's processing of the Navy's application for a Letter of Authorization, alleging that the NMFS was accepting the Navy's illegal actions. The notice did not include an allegation that the Navy was conducting LFA testing without permits. *See* Mot. Dis.Ex. 11. The Navy received a hard copy of the email letter in the U.S. mail on January 20, 2000; the Commerce Department received its copy on January 21, 2000. Plaintiffs filed suit on February 29, 2000. Whether notice is counted from the date of the email or the date the hard copy was received in the U.S. mail, February 29, 2000 is well short of the 60 day requirement.

The Court rejects Plaintiffs' contention that they did not assert causes of action based on the ESA until their First Amended Complaint, filed more than 60 days after they gave notice of ESA violations. Plaintiff's original complaint belies this contention. The cover page invokes the ESA. *See* Original Complaint at 1 (filed Feb. 29, 2000). Federal question jurisdiction is asserted because of violations of, *inter alia,* the ESA. *See id.* at 4. More importantly, although not enumerated as a separate claim, the ESA claim asserted in Count VI of the amended com-

plaint appears in the original complaint. *See* Original Complaint ¶ 49. Thus, Plaintiffs' argument that they did not raise ESA violations until the amended complaint is disingenuous.

Moreover, as to Count V, which alleges testing without permits, the Court finds that it is irrelevant whether the 60 days is counted from the original complaint or the amended complaint because Plaintiffs never gave the Navy notice of this alleged violation. No allegation of testing without permits is included in the January 14, 2000 email. Plaintiffs have not brought forth evidence of some other notice they gave the Navy of this alleged ESA violation.

Because Plaintiffs did not comply with the 60 day notice requirement, the Court must DISMISS Counts V and VI. As the *Hallstrom* Court explained, "The equities do not weigh in favor of modifying statutory requirements when the procedural default is caused by petitioners' failure to take the minimal steps necessary to preserve their claims." *Hallstrom*, 493 U.S. at 27, 110 S.Ct. 304 (quotations omitted). Accordingly, the Court DISMISSES Counts V and VI.

### 3. Ripeness

Defendants also challenge the ripeness of Plaintiffs' claims. They argue that the claims are not yet ripe for judicial review because they challenge ongoing agency action. Plaintiffs argue that their claims are ripe because the Navy's procedural violations and their illegal "irretrievable and irreversible commitments" constitute final acts of the agencies warranting review. Because the Court has already dismissed Claims V and VI for Plaintiffs' failure to comply with the ESA notice requirements, it will not analyze these claims for ripeness.

### a. Ripeness Doctrine and Review of Agency Actions

■ Ripeness doctrine determines *when* litigation may occur. The ripeness doctrine seeks to avoid litigation of matters that are premature for review because the injury is speculative and may never occur. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). In evaluating whether a particular matter is ripe for judicial resolution, the Court should "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.*

■ A finding of standing, by itself, is insufficient to render a case ripe for judicial resolution. *Socialist Labor Party v. Gilligan*, 406 U.S. 583, 588, 92 S.Ct. 1716, 32 L.Ed.2d 317 (1972). In *Gilligan*, after noting that the plaintiffs "may well meet the technical requirement of standing," the Supreme Court stated:

> This Court has recognized in the past that even when jurisdiction exists it should not be exercised unless the case tenders the underlying constitutional issues in clean-cut and concrete form. Problems of prematurity and abstractness may well present insuperable obstacles to the exercise of the Court's jurisdiction, even though that jurisdiction is technically present.

*Id.* 406 U.S. at 588, 92 S.Ct. 1716 (citations and quotation marks omitted).

The rationale behind the ripeness requirement has been discussed in light of administrative agencies. It is a policy:

> to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.

*Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 732–33, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998) ("*OFA*"). The *OFA* Court explained that ripeness doctrine protects courts from the situation where, "depending upon the agency's future ac-

tions to revise [a decision] or modify the expected methods of implementation, review now may turn out to have been unnecessary." *Id.* at 736, 118 S.Ct. 1665.

 Neither NEPA nor the MMPA provide a private right of action. Accordingly Plaintiffs must invoke this Court's jurisdiction under the APA, which provides for judicial review of two types of administrative action: "[1][a]gency action made reviewable by statute and [2] *final agency action* for which there is no other adequate remedy in a court." 5 U.S.C. § 704 (emphasis added). Because neither NEPA nor the MMPA provides for judicial review independent of the APA, Plaintiffs must establish "final agency action for which there is no other adequate remedy in a court." *Id.* If a party wishes to challenge "[a] preliminary, procedural, or intermediate agency action," such actions are "subject to review upon review of the final agency action." *Id.* In other words, for review of intermediate agency actions to be ripe, a party must wait until final agency action has taken place.

Recently, the Supreme Court clarified that "two conditions must be satisfied for agency action to be 'final'." *Bennett,* 520 U.S. at 177–78, 117 S.Ct. 1154. These are:

> First, the action must mark the consummation of the agency's decision making process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.

*Id.* (Internal quotations and citations omitted).

### b. The Court Finds Claims I, II, III, and VII Not Ripe For Adjudication under the APA

The Court finds that Claims I, II, III, and VII are not ripe for adjudication because there has been no "final" agency action that would allow review. All of Plaintiffs complaints go to flaws in ongoing processes, i.e., to decisions of a "tentative

or interlocutory" nature. Plaintiffs complain about the Navy making irreversible and irretrievable commitments to SURTASS LFA deployment while the EIS is pending. They also allege other illegalities in the EIS process, a pending application for a Letter of Authorization that they want to be denied, and Secretary Daley's failure to stop the NMFS from colluding with the Navy during the EIS process.

### i. Consummation of the Agency Decision Making Process

 Turning to the first prong of *Bennett*'s "final agency action" test, the Court cannot conclude that the acts in issue in any of these counts are the "consummation of the agency's decision making process." For example, as to Counts III and VII, there is no consummation of the agency decision making process by the NMFS *processing* the application for a Letter of Authorization. If the NMFS is *processing* the application, that necessarily means that it has not yet made a decision. Next, Plaintiffs' allegations in Count II that Defendants have been non-objective and have ignored certain procedural requirements in the EIS writing process do not show that the decision making process has been consummated. These are complaints about intermediate actions and are reviewable once a final EIS is issued and reviewed. *See* 5 U.S.C. § 704.

 Moreover, the Court also finds that the alleged "irretrievable and irreversible commitments" complained of in Count I do not mark a consummation of the decision making process. Plaintiffs complain that the Navy has spent $350 million on SURTASS LFA research and development, including construction of a vessel to transport the system. They allege that these "irretrievable and irreversible" commitments constitute a final action because they make deployment a foregone conclusion. The Court disagrees.

In *Metcalf v. Daley,* 214 F.3d 1135 (9th Cir.2000), the Ninth Circuit found that there had been an illegal irretrievable and

irreversible commitment of resources when an agency signed contracts with a tribe committing the agency to allow whaling prior to the completion[19] of the environmental assessment ("EA")[20] evaluating whether whaling should be allowed. *See id.* at 1138–40, 1143, 1145.

> [T]he record makes clear that the Federal Defendants did not even consider the potential environmental effects of the proposed action until long after they had already committed in writing to support the Makah whaling proposal.... NOAA signed the contract with the Makah in March 1996 and then worked to effectuate the agreement. It was at this juncture that it made an irreversible and irretrievable commitment of resources.

*Id.* at 1143. Thus, finding it "highly likely" that the EA which was eventually completed was slanted in favor of allowing whaling, the Ninth Circuit held that signing the contracts "amounted to a surrender of the Government's right to prevent activity in the relevant area." *Id.* at 1144. *See also Save the Yaak Committee v. Block,* 840 F.2d 714, 718–19 (9th Cir.1988) (summary judgment inappropriate in NEPA claim when government signed contracts for reconstruction of road before preparation of an EA when whether or not to reconstruct road was topic to be decided in EA).

The funds the Navy has spent to date undeniably show a significant interest in developing and researching SURTASS LFA technology. This in and of itself is not dispositive, however, as NEPA does not require agencies to be subjectively impartial. *See Metcalf,* 214 F.3d 1135, 1142. The decision to spend money on research and development of a weapons system does not lead, *a fortiori,* to the conclusion that deployment is inevitable. Common

sense dictates that an agency should do research when producing an EIS (or contemplating any action for that matter), as do federal regulations. *See* 40 C.F.R. § 1502.22(a). Additionally, the Navy has put forth evidence, and another judge in this district has found, that the research performed and the knowledge gained are useful for other pursuits than just SURTASS LFA deployment. *See Ocean Mammal Institute v. Cohen,* Civ. No. 98–00160 HG, at 19 (D.Haw. Mar. 9, 1998) (finding that SURTASS LFA research has broader applications than its import on the LFA System project, and is expected to benefit the scientific community as a whole). Furthermore, the Navy has put forth evidence that the ship it is building to carry the SURTASS LFA system would still be needed if SURTASS LFA is not deployed. *See* Aff. of Captain Samuel C. Miller ¶ 2, attached to Def. Reply Mot.Dis.; Aff. of Terry W.T. Shen. ¶¶ 4–7, attached to Def. Reply Mot.Dis. Specifically, there is evidence that the ship was designed to accommodate both SURTASS (passive) and SURTASS LFA (active) sonar systems and that the Navy can and will use the ship for passive sonar operations even if it never deploys SURTASS LFA. *See* Shen Aff. ¶ 6; Miller Aff. ¶ 2 ("The Navy would therefore complete, commission and employ the TAGOS–23 ship, with or without the LFA system embarked"). Moreover, the contracts the Navy signed for ships to be built and software to be developed do not bind the Navy to take a certain position with respect to deployment. The Navy is still free to decide that it does not wish to deploy SURTASS LFA. This is distinguishable from *Metcalf* and *Save the Yaak.* In those cases, contracts were signed binding the government to take certain positions before an EA was done

---

**19.** The Court notes that the complaint in *Metcalf* was not filed until after the completed EA was issued, despite the fact that plaintiffs therein complained about irretrievable and irreversible commitments made before the EA was completed. Here, of course, the final EIS has not been filed.

**20.** Under NEPA, an EA is a precursor to an EIS if it is not clear at first that an EIS is needed: the outcome of the EA dictates whether an EIS must be done, or, alternatively, if a finding of no significant impact ("FONSI") may be issued instead. *See* 40 C.F.R. § 1501.4.

evaluating those positions. In the instant case, the fact that the government has bound itself to pay its ship builders does not equate to the government binding itself to deploy SURTASS LFA. In short, the Navy's expenditures do not foreclose the possibility that deployment may be denied. Because the Court finds that the money spent by the Navy does not constitute an irretrievable and irreversible commitment to deployment, it cannot find that any of the actions complained of by Plaintiffs "mark the consummation of [Defendants'] decision making process[es]."

The Court also finds Ninth Circuit case law on "connected actions" instructive. Under NEPA regulations, the environmental effects of connected actions must be analyzed in a single EIS. *See Thomas v. Peterson,* 753 F.2d 754, 758 (9th Cir.1985). In *Thomas,* the Ninth Circuit found a NEPA violation because the government had not considered the environmental impact of timber sales when it prepared an EA for the construction of a logging road despite the fact that, "[i]t is clear that the timber sales cannot proceed without the road, and the road would not be built but for the contemplated timber sales." *Id.* The court continued, finding that "while the Service has stated that the road will yield other benefits, it does not claim that such other benefits would justify the road in the absence of the timber sales." *Id.* at 758–59. Finally, the court held that the error of not analyzing the timber and the road sales simultaneously could not be overcome with future EAs for contemplated timber sales because the fact that the road was already built would "swing the balance decidedly in favor of timber sales even if such sales would have been disfavored had road and sales been considered together before the road was built." *Id.* at 760. *Compare Sylvester v. U.S. Army Corps of Engineers,* 884 F.2d 394, 400 (9th Cir.1989) (not error to consider only golf course component, and not entire proposed resort complex, in EA when golf course "could exist without the other [parts of the

resort], although each would benefit from the other's presence.").

Although *Thompson* and *Sylvester* do not analyze whether a decision was a "final agency action" or whether an irreversible and irretrievable commitment was made, they do illustrate other situations where the question was whether the decision to do X made the decision to do Y a foregone conclusion. In *Thompson,* the Ninth Circuit found that the decision to build the road virtually preordained the decision to allow logging. Because the road would not have been built but to do timber sales, building the road always swung the balance in favor of logging. Here, however, the research done and the ship being constructed have other uses. *See* discussion *supra.* While the road was not needed unless logging was to occur, the Navy has put forth evidence that the ship is still needed if SURTASS LFA is not deployed. Thus, the Navy's expenditures do not swing the balance so in favor of deployment such that making the decision to do research and build boats equates to a final agency action on deployment. Instead, the instant situation is more analogous to *Sylvester.* The decision to build the golf course did not make the building of the other parts of the resort a foregone conclusion, therefore, analysis of the environmental impact of the golf course did not need to include the impact of the other resort components. The golf course could be built and exist without the other parts of the resort. Here, too, the research and the ship are useful whether deployment occurs or not. *See* discussion *supra.*

Finally, the District of Columbia Circuit case of *Taxpayers Watchdog, Inc. v. Stanley,* 819 F.2d 294 (C.A.D.C.1987), is also instructive. *Taxpayers* analyzed whether a railway construction project had been unlawfully "segmented" so as to frustrate effective environmental review. *See id.* at 298–99. This analysis required the court to examine, *inter alia,* whether an agency's contract to release funding for a 4–mile segment had substantial independent

utility and did not irretrievably commit federal funds for other, still unapproved rail extensions. *See id.* at 298. The court concluded that the agency's decision to spend $225 million on the 4–mile segment did not irretrievably commit funds towards the construction of the extensions. The Court also found that the 4–mile segment had independent utility because the city would benefit from its construction alone, even if no extension was ever built. *See id.* at 299.

Although *Taxpayers* does not analyze whether a final agency action occurred, it is helpful in determining whether the action taken here was "final" and therefore, whether the instant claims are ripe. *Taxpayers* held that spending $225 million on one part of a railway line was not a irreversible and irretrievable commitment towards an extension being built. The small part that was approved had independent utility and thus, it was not a foregone conclusion that an extension would be built. Here, the Navy has allegedly spent $350 million (over 20 years) on SURTASS LFA research and development, including building a ship to carry the system. The Court finds that the instant situation is analogous to *Taxpayers* in that the research and the ship have independent utility apart from deployment. As explained above, the research done by the Navy has benefits for the scientific community as a whole. *See Ocean Mammal Institute,* Civ. No. 98–00160 HG, at 19. Moreover, the ship the Navy built to carry SURTASS LFA will be needed to carry passive sonar operations (to which Plaintiffs do not object) even if SURTASS LFA is never deployed. *See* Miller Aff. ¶ 2. Accordingly, similarly to the holding in *Taxpayers,* this Court does not find that the Navy is irreversibly or irretrievably committed to deploy SURTASS LFA. That decision has yet to be made. For all the foregoing reasons, the Court finds that doing research and building a ship do not mark the consummation of agency decision making on deployment.

### ii. Determination of Rights or Obligations From Legal Consequences Will Flow

Looking at the next *Bennett* factor, the Court finds that the actions complained of in Counts I, II, III, and VII are not actions from which rights or obligations have been determined or from which legal consequences will flow. First, no rights or obligations have been determined by the NMFS processing the Letter of Authorization. The NMFS is completely free to deny the Navy's Letter of Authorization. The fact that it is processing the application means it has two choices—acceptance or denial. Next, no rights or obligations have been determined by the Navy's alleged failure to be objective. Additionally, the Navy has neither a right nor an obligation to deploy SURTASS LFA simply because it has tested and spent money on the system. The deployment decision awaits the final EIS. *See Ocean Mammal Institute* at 17 ("The [SURTASS LFA] research does not commit the government to deploying the LFA System, and the research does not determine the outcome of the EIS being prepared for the LFA System."). The Navy is completely free to cease its research in SURTASS LFA and pursue other submarine detection technology or make-do with the technology that currently exists. The Court finds that none of the acts complained of in Counts I, II, III, and VII are acts from which rights or obligations have been determined from which legal consequences will flow.

The Court concludes that Defendants have not taken final agency action in their issuance of the draft OEIS/EIS or acceptance of the application for a Letter of Authorization. Nor has there been final agency action via the alleged irretrievable and irreversible commitments made by the Navy. Because these contested actions are not final, they cannot form the basis of claims ripe for adjudication. Accordingly, Counts I, II, III, and VII are dismissed for

a lack of ripeness.[21]

### c. The Court Finds That Count IV Is Ripe For Adjudication

In Count IV, Plaintiffs allege that the Navy violated the MMPA by testing SURTASS LFA in international waters without permits. It also alleges other testing in March of 2000 without consulting the NMFS. Taking Plaintiffs' factual allegations in Count IV as true, there was clearly a "consummation of agency decision making process" when the Navy conducted SURTASS LFA (and LWAD) testing without obtaining permits. The decisions of whether to test and whether to get a permit have been made. There is nothing tentative or interlocutory about these decisions. Nothing more remains to be done or decided by Defendants. Furthermore, it is quite possible that legal consequences will flow from the Navy's decision to put both SURTASS LFA, and its theory that no permits are needed in international waters, to the test. If the Navy violated the MMPA by testing without a permit, there is nothing more that needs to be done to complete the violation. The Court thus finds Count IV ripe for review. To avoid dismissal, however, Count IV must survive Defendants' standing challenge, discussed *infra.*

### d. Plaintiffs Do Not Satisfy the Ripeness Requirements for Review of NEPA Claims

The Court finds an additional, alternative reason to hold that Counts I, II, and III (all NEPA claims) should be dismissed for a lack of ripeness. The ability of courts to review agency actions under NEPA is discussed in CEQ regulations. CEQ regulations are entitled to substantial deference by the courts. *See Save Our Ecosystems v. Clark,* 747 F.2d 1240, 1244 (9th Cir.1984).

*It is the Council's intention that judicial review* of agency compliance with these regulations *not occur before an agency has filed the final environmental impact statement,* or has made a final finding of no significant impact (when such a finding will result in action affecting the environment), *or takes action that will result in irreparable injury.* Furthermore, it is the Council's intention that *any trivial violation of these regulations not give rise to any independent cause of action.*

40 C.F.R. § 1500.3 (emphasis added). It is undisputed that Defendants have not filed a final EIS. *See* Mot.Dis.Ex. 2 (copy of the draft EIS, dated July 1999). Accordingly, suit under NEPA is only ripe if Defendants have taken "action that will result in irreparable injury" and is not "trivial."

The burden is on Plaintiffs to show irreparable injury in order to create subject matter jurisdiction. *See Thompson,* 99 F.3d at 353. The Court finds that they have not done so. Plaintiffs claim that "irreversible and irretrievable commitments in excess of $350 million" made by the Navy "could well result in irreparable injury to the environment and plaintiffs' interests." Opp.Mot.Dis. at 13. Even assuming that the Navy continues committing resources towards SURTASS LFA technology, Plaintiffs do not demonstrate that irreparable harm will result. Indeed, the Navy has brought forth evidence to the contrary, showing that the money and energy it has expended on SURTASS LFA research and potential deployment has other uses if SURTASS LFA is not deployed. *See* discussion subpart b, *supra.* In contrast, Plaintiffs' allegations of harm are conclusory and speculative. Speculative harm does not suffice to establish the requisite irreparable injury. *See National*

---

**21.** The Court notes that recent news reports about non-SURTASS LFA sonar testing off of New Jersey being suspended show that the Navy is aware of concerns and potential problems with its sonar research on marine life.

*See* footnote 11, *supra.* The suspension of the New Jersey testing is also an illustration of the concern in *OFA* for situations where "review now may turn out to have been unnecessary." *OFA,* 523 U.S. at 736, 118 S.Ct. 1665.

*Wildlife Federation v. Burlington Northern Railroad, Inc.*, 23 F.3d 1508, 1512 (9th Cir.1994).

Accordingly, the Court finds that the CEQ regulations are an additional, alternative basis under which Counts I, II, and III must be dismissed for a lack of ripeness.

### 4. Standing

 Defendants also argue that Plaintiffs lack standing as to all claims. While ripeness determines *when* litigation may occur, standing is concerned with *who* is a proper party to litigate a particular matter. Plaintiffs contend that they have standing.

 Plaintiffs have the burden of establishing that they have standing to raise the claims asserted. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). For purposes of a motion to dismiss, in considering a challenge to standing, a court takes as true all material allegations of the complaint and construes the complaint in favor of the plaintiff. *See id.*

 To have standing to maintain a suit, a plaintiff must prove: (1) "an injury in fact;" (2) "a causal relationship between the injury and the challenged conduct;" and (3) "a likelihood that the injury will be redressed by a favorable decision." *Northeastern Florida Chapter of the Associated General Contractors v. Jacksonville*, 508 U.S. 656, 663–64, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993). "Injury in fact" requires an "invasion of legally protected interest which is (a) concrete and particularized and (b) 'actual or imminent', not 'conjectural' or 'hypothetical'." *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130.

 "Injury in fact" requires more than an injury to a cognizable interest; it requires that the party seeking review be "among the injured." *Lujan*, 504 U.S. at 563, 112 S.Ct. 2130. Being "among the injured" means that generally a plaintiff "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third persons." *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). A group may sue on behalf of members, but "mere interest in a problem" is not sufficient by itself to render the organization "among the injured." *See Sierra Club v. Morton*, 405 U.S. 727, 739–40, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). Instead, the group must show that it or its members are injured. *See id.*

 A plaintiff may obtain standing by asserting solely procedural wrongdoing, but only when the violation of those procedures could impair a separate concrete interest of the plaintiff that the procedures in question were designed to protect. *See Lujan*, 504 U.S. at 572–73 & n. 8, 112 S.Ct. 2130 (rejecting the idea that the injury-in-fact requirement was satisfied by a congressional conferral upon all persons to an abstract "right" to have the Executive observe procedures required by law). In other words, the requirement of injury-in-fact still applies when a plaintiff asserts only procedural harms.

 In addition, parties seeking prospective injunctive relief "must show that [they] 'ha[ve] sustained or [are] immediately in danger of sustaining some direct injury' as the result of the challenged official conduct and the injury or threat of injury must be both 'real and immediate,' not 'conjectural or hypothetical.'" *City of Los Angeles v. Lyons*, 461 U.S. 95, 102–03, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief." *Id.*

 Finally, in addition to these constitutional requirements, a plaintiff challenging a statutory provision under the APA must show that the injury he or she has suffered falls within the "zone of interests" that the statute was designed to protect. *See Douglas County v. Babbitt*, 48 F.3d 1495, 1499 (9th Cir.1995). The plain-

tiff need only show that the injury he complains of falls within the "zone of interests" sought to be protected by the provision whose violation forms the legal basis for his complaint. *See Bennett,* 520 U.S. at 176, 117 S.Ct. 1154. The "zone of interests" requirement does not exist for suits brought under the ESA. *See id.* at 164, 117 S.Ct. 1154. Accordingly, Plaintiffs need only show that the injuries they suffer fall within the zone of interests for Counts I, II, III, IV, and VII.

### a. Injury in Fact

■ The Court begins by finding that plaintiff Julie Jacobson has not alleged any injury in fact and should be dismissed as a plaintiff. All that Jacobson has alleged is that she is aware of harm done to a swimmer and that she's obliged to protect the citizens, environment, and economy of the county of Hawaii. Jacobson does not assert her own legal rights and interests, only those of her constituents. She cannot rest her claim of standing on the legal rights or interests of third parties. *See Warth,* 422 U.S. at 499, 95 S.Ct. 2197. Accordingly, Jacobson fails the first prong of standing. Her claims are DISMISSED.

All remaining Plaintiffs are groups. One or more members of Plaintiffs' groups, or the groups themselves, must be directly affected by acts at issue to have standing. *See Lujan,* 504 U.S. at 563, 112 S.Ct. 2130. The Court will separate its analysis of the groups' claims into allegations of procedural violations (Counts I, II, III, VI, and VII) and substantive violations (Counts IV and V).

### i. Procedural Violations

The Court finds that none of the groups have standing on Counts, I, II, III, VI,[22] and VII because none allege an injury in fact from the alleged procedural violations. As explained above, and as Plaintiffs correctly argue, standing may be found from allegations of purely procedural injuries.

*See Lujan,* 504 U.S. at 572–73 & n. 8, 112 S.Ct. 2130. A plaintiff must still meet the injury-in-fact requirement, however. *See id.* A plaintiff trying to show standing from procedural injuries must show that "the procedures in question are designed to protect some concrete interest of his that is the ultimate basis of his standing." *Id.* at 573 n. 8, 112 S.Ct. 2130. This requirement prevents Plaintiffs from litigating "generally available grievance[s] about government." *Id.* at 573, 112 S.Ct. 2130. A plaintiff must allege more than an abstract "right" to have the executive branch observe procedures required by law. *Id.*

■ The crux of Plaintiffs' procedural claims is that irreversible and irretrievable commitments of resources have been made before the issuance of a final EIS. Plaintiffs allege that they or their members "are harmed by this attempt to subvert the required process," "are harmed by Defendant NMFS legitimizing the illegal acts of Defendant Navy to date through the acceptance and processing of the application for a Letter of Authorization," and *"will* be harmed" *if* the Letter of Authorization tainted by these violations and bad faith is granted. *See* Compl. at 22–23. Plaintiffs also claim harm to their members who have been frustrated in attempts to show the Navy that there is a "no action alternative," i.e. an option to not deploy SURTASS LFA. Finally, Plaintiffs assert that they *"will* be harmed" *"if* Defendant Navy decides to deploy SURTASS LFA based on an EIS compromised by extensive irreversible and irretrievable commitments." *See* Compl. at 22; Opp.Mot.Dis. at 10.

While Plaintiffs allege harm, the allegations are not "concrete" or "particularized." Nor is the harm alleged to be imminent. Indeed, as the Court discussed at length in the earlier section on ripeness, these procedural claims are not ripe because they do not allege any final agency action. Plaintiffs cannot have suffered an injury in fact when Defendants have not

---

**22.** The Court has already ruled that Count VI is dismissed because of Plaintiffs' failure to

comply with the 60 day notice requirement. The Court rules here in the alternative.

yet taken final action. *See* discussion in Part 3, *supra.* Instead, Plaintiffs' complaints are really just generalized concerns about a government functioning in a manner contrary to the way Plaintiffs wish it functioned. To the extent their allegations are more specific (i.e., harm from deployment of a sonar research system authorized via a "compromised" EIS) the claims are conjectural and speculative. Counts I, II, III, VI, and VII are alternatively dismissed because all Plaintiffs lack standing to sue.

### ii. Substantive Violations

The Court now turns to Counts IV and V.[23] Counts IV and V allege that the Navy has been testing SURTASS LFA in international waters without permits. Count IV alleges that these actions violated the MMPA and Count V alleged that these actions violated the ESA.

■ The Court finds that Plaintiff Green Party fails to show an injury in fact as to Counts IV and V. The testing that was allegedly performed took place in either unnamed "international waters"[24] or off the coast of the Bahamas. Green Party alleges that its members use the waters surrounding *Hawaii* for *inter alia,* scientific study, whale watching, recreation, sport, food, and personal restoration and healing. *See* Compl. at 4. These allegations would be sufficient to establish an injury in fact if Green Party had alleged that one of these activities was injured somehow by Defendants. *See, e.g., Japan Whaling Assoc. v. American Cetacean Soc.,* 478 U.S. 221, 230 n. 4, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986) (group who sued to stop ongoing whaling sufficiently aggrieved by the agency's action because the whale watching and studying of their members will be adversely affected by continued whale harvesting); *see also Idaho Farm Bureau Federation v. Babbitt,* 58 F.3d 1392, 1398–99 (9th Cir.1995) (environ-

mental group whose members lived in the state, visited the area where snails found, and maintained a factual and scientific understanding of the snail, its habitat, and threats to the species had standing to challenge failure to list snail as endangered species). However, all Green Party asserts is that testing without permits was done elsewhere in the world. This does not allege a concrete or particularized injury in fact to Green Party or its members. Green Party does not allege that the whales affected in these international waters would have come to Hawaii so that its members could engage in their scientific study, whale watching, and personal restoration and healing. Nor does Green Party allege that testing of whales in the Atlantic Ocean injures its or its members ability to engage in recreation, sport, and food gathering. In fact, Green Party does not even allege that whales anywhere were hurt by the testing—the alleged harm is that testing was done without permits. Without an allegation that the testing without permits interferes with one of Green Party's interests, Green Party has not alleged an injury in fact. Accordingly, the Court finds that Green Party lacks standing as to Counts IV and V.

For the same reasons that Green Party lacks standing as to Counts IV and V, the Court finds that Kohanaiki 'Ohana, an environmental group "whose goal is to protect the cultural and environmental integrity of Hawai'i's oceans and land" lacks standing as to Counts IV and V. These allegations assert harm done in other parts of the world and do not allege that injury was done to the limited sphere in which the group is concerned. No allegation of injury to an interest of Kohanaiki 'Ohana can possibly be inferred.

■ The Court now looks at the standing of the remaining environmental groups regarding Counts IV and V. These groups allege interests in the sanctity of the ma-

---

**23.** The Court has already ruled that Count V is dismissed because of Plaintiffs' failure to comply with the 60 day notice requirement. The Court rules here in the alternative.

**24.** All locations named have been in the Atlantic Ocean, i.e., the Azores, Bahamas, and Dominica.

rine environment, the effect of LFA sonar on marine animals, and the regulatory process. *See id.* at 6–10. They claim harm by the Navy's performance of LFA tests in international waters without seeking required permits. *See* Compl. ¶ 85. These allegations are insufficient to assert an injury in fact. The Court does not question the groups' sincerity that they are bothered when LFA testing occurs without permits. However, "mere interests in a problem" is not sufficient by itself to render the organization "among the injured" without more. *See Morton,* 405 U.S. at 739–40, 92 S.Ct. 1361. The remaining environmental groups simply have not alleged "more" by way of concrete, particularized injury from the (alleged) fact that the Navy performed testing and that it did so without a permit. Accordingly, Counts IV and V are dismissed as to the remaining environmental group Plaintiffs.

Because the Court finds that none of Plaintiffs have alleged a sufficiently "particularized" or "concrete" injury in fact, it need not analyze the other two *Lujan* standing factors, both of which are premised on there being an injury. Furthermore, because the "zone of interests" analysis is a requirement of standing in addition to the constitutional standing factors discussed in *Lujan,* the Court need not address whether Plaintiffs fall within the zone of interests of the statutes under which they filed suit. Because the Court finds that none of Plaintiffs have standing as to any of their claims, it DISMISSES Counts I through VII.

### CONCLUSION

For the foregoing reasons, the Court DENIES Green Party's Motion to Set Aside Order and to Consolidate Reopened Case with Pending Case in Civ. No. 98–232 ACK. The Court GRANTS Defendants' Motion to Dismiss in Civ. No. 00–166 ACK.

IT IS SO ORDERED.